Patsy F. DiZenzo and Anna DiZenzo, et al. * v. Commissioner. Di Zenzo v. Commissioner
Docket Nos. 72736-72739.
United States Tax Court
T.C. Memo 1964-121; 1964 Tax Ct. Memo LEXIS 217; 23 T.C.M. (CCH) 677; T.C.M. (RIA) 64121; April 30, 1964
*217 1. Held, that the corporate petitioner failed to report in its returns substantial amounts of income from its contracting business. The amount of its gross receipts, costs of operations, and net profits determined. 2. Held, that some part of the deficiency due from the corporate petitioner for each of the years 1946 through 1950 is due to fraud with intent to evade tax and that such petitioner is liable for additions to tax under section 293(b) of the Internal Revenue Code of 1939. 3. Held, that such petitioner's return for each of the taxable years 1946, 1947, and 1948 was false and fraudulent with intent to evade tax and that, under section 276(a) of the Code, assessment and collection of the deficiencies due for those years are not barred by the statute of limitations. 4. Held, that the individual petitioners failed to report in their returns substantial amounts of income, including amounts of corporate receipts diverted by the petitioner Patsy F. DiZenzo to his own use from the corporate petitioner and another corporation which he owned and controlled. 5. Held, that some part of the deficiency due from the individual petitioners for each of the taxable years 1946 through 1951 *218 is due to fraud with intent to evade tax and that such petitioners are liable for additions to tax under section 293(b) of the Code. 6. Held, that the joint return of the individual petitioners for each of the taxable years 1946 through 1950 was false and fraudulent with intent to evade tax and that assessment and collection of the deficiencies due for those years are not barred by the statute of limitations. 7. Held, that the petitioner Patsy F. DiZenzo is liable, as a transferee, to the extent of his diversions of receipts of the corporate petitioner, for any taxes due from the corporate petitioner. 8. Held, that the respondent has not met the burden of proving that the petitioner Anna DiZenzo is liable, as a transferee, for the transferee liability of the petitioner Patsy F. DiZenzo, since he has failed to show that, under the law of the State of Connecticut, transfers of property and money to her were void for actual fraud or constructive fraud. Hirsh Freed, 85 Devonshire St., Boston, Mass., and Harold Lavien, for the petitioners. Frederick A. Griffen and Meade Emory, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies *219 in income tax and additions to tax as follows: Docket No. 72738, Patsy F. DiZenzo and Anna DiZenzo Additions under
Income Tax
Sec.
Sec.
Year
Deficiency
293(b)
294(d)(2)
1946
$13,358.72
$ 6,679.36
$ 804.16
1947
42,847.28
21,423.64
2,574.05
1948
29,860.19
17,056.16
2,046.74
1949
4,689.96
2,344.98
299.44
1950
3,343.54
1,671.77
200.76
1951
114.38
57.19
49.31
Docket No. 72739, Patsy Frank, Inc. Income
Additions under
Year
Tax Deficiency
Sec. 293(b) *
1946
$13,555.55
$ 6,777.78
1947
22,465.36
11,232.68
1948
20,540.99
10,270.49
1949
822.82
411.41
1950
1,269.61
634.81
The respondent also determined that Patsy F. DiZenzo is liable, as transferee of assets of Patsy Frank, Inc., for the deficiencies in tax and additions to tax determined against Patsy Frank, Inc. (Docket No. 72736) and that Anna DiZenzo is, in turn, liable as a transferee of Patsy F. DiZenzo (Docket No. 72737) for such deficiencies and additions. Certain of the issues raised by the pleadings have been settled by stipulations of the parties. The issues remaining for decision are: (1) Whether the respondent's determination of gross receipts of the corporation from various contracting jobs performed in certain years *220 in question was excessive; (2) Whether the corporation is entitled for each year to greater amounts of operating costs than allowed by the respondent in computing gross profit derived by the corporation from the contracting jobs; (3) Whether assessment and collection of any deficiencies in tax due from the corporation for the taxable years 1946, 1947 and 1948 are barred by the statute of limitations; (4) Whether any part of any such deficiency for any year in question is due to fraud with intent to evade tax; (5) Whether, for each year, the respondent's determination of taxable income of the individuals resulting from diversion of corporate receipts was excessive; (6) Whether the gain from the sale of certain property in 1948 is taxable in full or is taxable as long-term capital gain; (7) Whether assessment and collection of any deficiencies in tax due from the individuals for any of the taxable years 1946 through 1950 are barred by the statute of limitations; (8) Whether any part of any such deficiency for any year in question is due to fraud with intent to evade tax; (9) Whether for each year the individual petitioners are liable for an addition to tax for underestimation of estimated *221 tax; (10) Whether the petitioner Patsy DiZenzo is liable, as transferee, for any deficiencies in tax and additions to tax due from the corporation; and (11) Whether the petitioner Anna DiZenzo is liable, as transferee of her husband, for any such deficiencies in tax and additions to tax. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Patsy Frank, Inc. (sometimes hereinafter referred to as the corporation), was incorporated under the laws of the State of Connecticut on July 16, 1928, with capital stock of $10,000, to engage principally in the contracting business. At all times material hereto, the corporation reported its taxable income on the cash receipts and disbursements method of accounting and on a calendar year basis. It filed its Federal income tax returns for the taxable years 1946 to 1950, inclusive, with the district director of internal revenue at Hartford, Connecticut. At all times material hereto the officers and stockholders of the corporation were as follows: Per
cent of
stock
Name
Title
held
Patsy Frank DiZenzo
President & Trea-
surer
98
Anna DiZenzo
Secretary
1
William DiZenzo
Vice-president and
Assistant Trea-
surer
1
In June *222 1950, Patsy Frank, Inc., sold its equipment to William DiZenzo, son of Patsy Frank DiZenzo and Anna DiZenzo, for $2,300 and ceased business operations. Patsy Frank DiZenzo (also known as Patsy Frank) and Anna DiZenzo, at all times material hereto, were husband and wife and resided at 424 Church Hill Road, Bridgeport, Connecticut. For the years 1946 to 1951, inclusive, they reported their income on the cash receipts and disbursements method of accounting on a calendar year basis. They filed joint Federal income tax returns for those years with the district director of internal revenue at Hartford, Connecticut. Hereinafter Patsy Frank DiZenzo will sometimes be referred to as the petitioner. In addition to his controlling stock ownership of Patsy Frank, Inc., the petitioner was at all times relevant hereto the controlling officer-stockholder of the Putnam Realty Co., Inc., the principal business of which consisted of the rental and maintenance of an apartment building which it owned in Bridgeport, Connecticut. The petitioner's formal education terminated in 1913 after his completion of two months in the 9th grade, at which time he went to work in the construction field, later engaging *223 in concrete and masonry work with his father. About 1927 he entered into the general contracting business, including the building of garages and small shops and homes for sale. In 1928 he organized Patsy Frank, Inc., to engage in such activities, investing $10,000 in its stock. Prior to the taxable years in question, the corporate office was in petitioner's home. During the years in question, the office was at 1286 Kossuth Street, Bridgeport, Connecticut. It did not own any real estate. The office equipment consisted of two desks, two chairs, a table, and a filing cabinet. The equipment which the corporation employed consisted of a pick-up truck, a small concrete mixer, wheel barrows, picks, shovels, hoes, rakes, scaffolding, etc. During the period 1946 through 1950, inclusive, the corporation was engaged in general masonry and carpentry work on shops, stores, garages, gas stations, etc., with all plumbing and electrical work and some masonry and carpentry work being let out on a subcontract basis. The petitioner, in his individual capacity, also engaged in certain business activities, including the ownership, construction, and sale of real property and the receipt of rentals. The *224 corporation, as well as each of the individual petitioners, maintained a checking account at the First National Bank & Trust Company at Bridgeport. The individuals maintained savings accounts at various banks. The petitioner rented a safe deposit box during each of the years in question. The petitioner drew all corporate checks, making notations of such checks on the stubs. The only other records kept by the corporation consisted of a cash disbursements book containing entries commencing in December 1946 and ending in August 1950, time sheets for employees, some job site notations made by the petitioner, and material invoices from suppliers, except invoices received in connection with cost-plus contracts which were given by the corporation to the customer for the purpose of substantiating the cost involved. The record does not show what, if any, books and records the individual petitioners maintained with respect to their personal transactions. The corporation did not employ a bookkeeper or secretary. It employed on a parttime basis at a fee of $75 per year an accountant, Thomas Adiletta, who made the entries in the cash disbursements book from the check stubs made available to him. *225 All entries in the cash disbursements book represented payments made by check, but it did not contain all of the payments which were made by check. The invoices and notations were customarily retained in one of the filing cabinet drawers and were available to the accountant. The accountant prepared the income tax returns for the individual petitioners and for the corporation, using such records as were available. However the records kept were inadequate for the purpose of computing the taxable income of the corporation and the individual petitioners. At the time of preparing the corporate tax returns the petitioner would confer with the accountant and furnish information with respect to individual jobs. The accountant prepared work sheets which were customarily attached to the retained copies of the returns. The petitioner on such work sheets customarily made lists of gross receipts of the corporation on a job-by-job basis. Commencing in early 1952 revenue agent Everett Dowdney and special agent Richard Baker made an investigation of Putnam Realty Co., Inc., covering its taxable years ended May 31, 1948 through May 31, 1951. The investigation was expanded to include the tax liabilities *226 of Patsy Frank, Inc., for the taxable years 1946 through 1950 and of the individual petitioners for the taxable years 1946 through 1951. Agent Dowdney spent about 300 working days in the combined investigations. In their investigations the revenue agents examined, among other things, such records of the corporation as were available; the corporate and individual tax returns; the corporation's retained copies of its returns; the records of the building inspectors of Bridgeport, Fairfield, Stratford, Trumbel, and Milford, Connecticut; the records of the First National Bank & Trust Company at Bridgeport and other banks relating to deposits to and payments from bank accounts maintained by the corporation and the individual petitioners; and mortgage records. In order to determine the gross receipts of the corporation for the taxable years 1946 through 1950, the revenue agents ascertained from the bank records the names of the payors of checks deposited in the various bank accounts of the corporation and the individuals and interviewed such payors. They also examined the lists of gross receipts from the various jobs contained in the accountant's work sheets, when available. Such lists were *227 available for the taxable years 1946, 1949, and 1950, but no lists were available for the taxable years 1947 and 1948. In determining the corporation's operating costs to determine gross profit, the agents compared the costs shown in the corporate returns with the items appearing in the cash disbursements book and items appearing on Adiletta's work sheets, when available. Since the operating costs shown in the cash disbursements book could not consistently be identified with specific jobs, and since there were no other records kept or furnished sufficient to identify particular costs with particular jobs, the agents were unable to reconstruct the corporation's gross profit and net income in any year on a job-by-job basis. Nor could they determine whether costs of a particular job were omitted from the tax returns other than certain costs identified in a stipulation of facts submitted in evidence. In their computations the agents allowed substantially all operating costs claimed on the returns (consisting of salaries and wages, cost of materials and supplies and payments to subcontractors) and in addition substantially all of the additional operating costs shown in the cash disbursements *228 book which had not been claimed on the returns. In addition, the agents analyzed the disbursements by check from the bank accounts of both the corporation and the individual petitioners to determine whether there had been additional payments of operating costs of the corporation. As a result, they determined that during each of the taxable years disbursements had been made by the petitioner by checks representing operating costs of the corporation in addition to those shown by the corporation on its records and in its returns. The agents allowed these additional amounts, although they were unable to identify all the costs to partciular jobs. During the investigations the petitioner told the agents that there had been cash expenditures for operating costs but did not substantiate any such expenditures or relate them to particular jobs. The agents interviewed material suppliers and subcontractors and made inquiry as to whether the corporation or the petitioner had paid them any amounts in currency. Their investigation failed to disclose that any operating costs were paid by cash rather than by check, and accordingly they did not allow any amounts as operating costs paid in currency. *229 As a result of the investigations by the revenue agents the respondent in the notices of deficiency determined that the corporation had understated its net income for each of the taxable years 1946 through 1950 and that the individual petitioners had understated their net income for each of the taxable years 1946 through 1951. The detailed facts will be set forth by years. Corporation - Taxable year 1946 The following tabulation shows the gross receipts, operating costs, operating profit, deductions, and net income as reported by the corporation in its income tax return for its taxable year 1946 and such items as redetermined by the respondent: As Adjusted
Reported
by the
Per Return
Respondent
Gross Receipts
$74,804.66
$119,917.90
Operating Costs
74,823.88
76,916.80
Operating Profit
(19.22)
43,001.10
Deductions
3,273.65
3,273.65
Net Income
(3,292.87)
39,727.45 The corporation reported no tax liability. The following tabulation shows gross receipts of the corporation from jobs performed in 1946, together with the amounts thereof included by the corporation in its return, and the amounts not reported in its return: Amounts
Amounts Unre-
Gross
Included
ported (or
Receipts of
by Corp.
overreported)
the Corp.
in Return
by Corp.
Chemical Plating Co.
$ 26,355.01 * *230 $18,253.52
$ 8,101.49
Louis Lebenthal/Lebenthal and Co.
10,500.00 *
9,000.00
1,500.00
M. Lorenz
2,911.52 *
2,911.52
August Mendes
1,250.00 *
1,200.00
50.00
Joh Moore Convalescent Home
2,195.62 *
1,948.74
246.88
Nicholas Methodist Church
1,106.00
1,106.00
John Samjai
1,250.00
1,250.00
Boering Specialty Co.
8,075.00
8,075.00
Walter Griffith Company
8,000.00 *
8,000.00
Mary E. Franko
182.49
182.49
Conn. Web & Buckle Co.
1,722.71
1,739.73
(17.02)
John Gabriel
1,080.00
1,086.01
(6.01)
Joseph Papallo
233.45
233.45
George LePia
200.00
200.00
Putnam Realty Co.
297.76 **
180.55
117.21
E. R. Clement, Inc.
21,708.34
20,499.17
1,209.17
Antonio Rendo (Brook St.)
9,000.00
9,000.00
Sam Sellas
1,400.00
1,400.00
Wesley Berman
450.00 **
450.00
Patsy F. DiZenzo and Anna DiZenzo
(office bldg. at 1286 Kossuth St.)
9,000.00 **
9,000.00
Total
$106,917.90
$74,804.66
$32,113.24
All the above gross receipts were stipulated except the amount of $9,000 received by the corporation from the individual petitioners on account of the building at 1286 Kossuth Street. The respondent had included in the total gross receipts of the corporation for the year 1946 an amount of $22,000 on account of the construction of this building for the individual petitioners. The cost incurred by the corporation in the construction of the building was $9,000 and only that amount was charged by the corporation to the individual petitioners and paid by them for such construction. Other 1946 jobs included in the tabulation will be considered in the order in which they appear above. Chemical Plating Company - The list contained in Adiletta's work sheets shows the total amount of the job as $22,753.52 rather than $26,355.01 as stipulated. A part of the consideration received consisted of a mortgage note of $4,500. Although such note was shown in such list, its value was not included in the return as a part of gross receipts of the year 1946. In the $4,500 mortgage note the petitioner, rather than the corporation, was named as the payee. Louis Lebenthal/Lebenthal *231 and Company - In 1946 a check in the amount of $3,000 was drawn by Louis Lebenthal in favor of the corporation, but such check was endorsed by the petitioner and deposited in his individual checking account at the First National Bank and Trust Co. August Mendes - In 1946 the petitioner, rather than the corporation, received currency payments of $1,250 from August Mendes for this job. John Moore Convalescent Home - On Adiletta's work sheets the gross receipts from this job were listed at $1,948.74 and this was the amount included in the corporate return. In 1946 a check in the amount of $1,948.74 was drawn by the John Moore Convalescent Home in favor of the corporation, but such check was endorsed by the petitioner and deposited in his individual checking account. In the same year the Home drew a check in the amount of $118.01 in favor of the corporation, but such check was endorsed by the petitioner and deposited in a checking account of Putnam Realty Co., Inc. Nicholas Methodist Church - In 1946 a check in the amount of $1,106 was drawn by the Nicholas Methodist Church in favor of the corporation, but such check was endorsed by the petitioner and deposited in his individual checking *232 account. John Samjai - In 1946 the petitioner, rather than the corporation, received a check from John Samjai in the amount of $600 which he deposited in his individual checking account. Walter Griffith Company - In 1946 a check in the amount of $3,000 was drawn by the Griffith Company in favor of the corporation, but such check was endorsed by the petitioner and deposited in his individual checking account. On the same day the Griffith Company drew another check in the amount of $2,000 in favor of the petitioner which he deposited in his individual checking account. John Gabriel - In 1946 a check in the amount of $1,010 was drawn by John Gabriel in favor of the corporation, but such check was endorsed by the petitioner and deposited in his individual checking account. In the same year John Gabriel drew a check in the amount of $70 in favor of the corporation, but such check was endorsed by the petitioner and deposited in a checking account of the Putnam Realty Co., Inc. Putnam Realty Co., Inc. - The gross receipts from this job were stated in the list in Adiletta's work sheets as $180.55. E. R. Clement, Inc. - The gross receipts on this job were shown in the list contained in Adiletta's *233 work sheets as being $20,499.17 instead of the amount of the stipulated gross receipts of $21,708.34. The contract between the corporation and E. R. Clement, Inc., specified that the price to be paid for the work performed by the corporation was to be 10% net above all costs. In 1946 a check in the amount of $15,000 was drawn by E. R. Clement, Inc., in favor of the corporation, but such check was endorsed by the petitioner and deposited in his individual checking account. During the same year a check in the amount of $1,000 was drawn by E. R. Clement, Inc., in favor of the corporation, but such check was endorsed by the petitioner and deposited in a checking account of the petitioner Anna DiZenzo. Antonio Rendo - (Brook Street house) - The amount of $9,000 gross receipts from this job was not included in the list of receipts contained in Adiletta's work sheets. In 1946 a check in the amount of $1,000 was drawn by Antonio Rendo in favor of the petitioner who cashed the check. In 1946 the individual petitioners drew checks on their personal bank accounts in the amount of $2,092.92 in favor of third parties on behalf of the corporation. This amount was not claimed by the corporation *234 as a part of cost of operations in its income tax return but in the notice of deficiency the respondent increased cost of operations by this amount. In 1946 the corporation had operating costs, in addition to those allowed by the respondent, of $14,000. Individuals - Taxable year 1946 In their joint income tax return for the taxable year 1946 the individual petitioners reported net income of $3,858.35 and tax liability of $564.40. As a result of the revenue agents' investigations, the respondent in the notice of deficiency determined their net income to be $33,548.12. Petitioners did not report as income any corporate funds diverted. Among the items added by the respondent to reported net income was the amount of $24,699.16 determined to be corporate income diverted by the individual petitioners to their own use. During the taxable year 1946 the petitioner deposited checks totaling $28,308.37 to the bank account of the corporation. Of this amount $17,400 constituted funds transferred from the petitioner's bank account and the rest consisted of checks received by the individual petitioners from third parties representing rental income, interest and insurance dividend income, proceeds *235 on sales of property, return of capital receipts, and salary of both the individual petitioners. In computing the net amount of corporate income so diverted, the respondent credited all the amounts hereinabove mentioned which were paid by the individuals to the corporation or on its behalf and, in addition, an amount of $2,502.30 expended by them for the purchase of equipment for the corporation. [1] The individual petitioners also made currency payments in 1946 on behalf of the corporation in the amount of $1,000. The net amount of corporate receipts diverted to the use of the individual petitioners in 1946 was $10,699.16. The respondent determined that the petitioners omitted from their return capital gains of $2,436.18. It has been *236 stipulated that the amount of taxable capital gains which was omitted was $2,099.06. The respondent determined, and it is stipulated, that the petitioners failed to report interest income in the amount of $134.97. The respondent determined, and it is stipulated, that the petitioner failed to report taxable gain in the amount of $1,034.25 upon the surrender of a matured endowment policy on his life. In their return for the taxable year 1946 the petitioners claimed itemized deductions totaling $1,076.30. Included in the claimed deductions was an amount of $625 claimed as interest on a mortgage. The respondent disallowed this claimed deduction of $625 for lack of substantiation. He accordingly allowed the standard deduction of $500 in lieu of any itemized deductions. In their return for the taxable year 1946 the petitioners had included as gross rental received from 3 stores located at Pearl and Main Streets in Bridgeport, Connecticut, the amount of $5,040 which was offset by depreciation, repairs, and other expenses totaling $3,294.39, which included $750 claimed as interest paid on a mortgage on this property. The net profit from rents was reported as $1,745.61. During 1946, and continuing *237 until June 30, 1948 when it was paid, the amount of the mortgage was $155, and the amount of interest paid on the mortgage by the petitioners in 1946 was only $11.64. The respondent determined, and it is stipuated, that the petitioners failed to report taxable rental income in the amount of $808.91. Corporation - Taxable year 1947 The following tabulation shows the gross receipts, operating costs, operating profit, deductions, and net income as reported by the corporation in its income tax return for its taxable year 1947 and such items as redetermined by the respondent. As Adjusted
Reported Per
by the
Return
Respondent
Gross Receipts
$97,801.50
$160,429.94
Operating Costs
90,547.77
95,056.77
Operating Profit
7,253.73
65,373.17
Deductions
6,929.75
6,074.75
Net Income
323.98
59,298.42
The corporation reported tax liability of $68.04. During the taxable year 1947 the corporation received the following gross receipts for services rendered: Boering Specialty Co.
$ 4,390.26
California Oil Marketeers
9,835.00 **
Connecticut Web & Buckle Co.
78.90
Leonard Garcy
325.00
Great A & P Tea Co.
312.50
Walter Griffith Co.
3,500.00 * *238 Pheilee Gumbus
1,000.00
Stephen Cochiss
10,200.00 *
Louis Lebenthal/Lebenthal and
Company
3,270.32 *
Michael Lucay
59.13 **
Angelo Marino
3,265.82 **
Moore Convalescent Home
2,137.95 *
Marie Osso
225.00
Patrick and Pearl Panuzio
(home remodeled)
17,000.00
Putnam Realty Co.
612.00 **
Harry Rossinsky
3,759.00
Clifford P. Sherman
20,353.54 *
Ellsworth F. Smith
3,411.47 **
Leonard Verrilli
2,000.00 *
Armen Wollner
823.14
Edward Demovick
27,490.13
Martin Jaster
534.20
Antonio Rendo (Kossuth St.
houses)
21,216.75
Sam Sobel
1,770.83
Patsy F. and Anna DiZenzo
(East Main St. store addition)
22,859.00 **
$160,429.94
In reporting gross receipts of $97,801.50 in its return for the taxable year 1947, the corporation did not identify the jobs involved. Nor are Adiletta's work sheets or any other lists available to identify the reported gross receipts on a job-by-job basis. The 1947 jobs will be considered in the order in which they appear in the above tabulation. Boering Specialty Co. - In 1947 the Boering Specialty Co. issued two checks in favor of the corporation in the respective amounts of $1,390.26 and $3,000 which were endorsed by the petitioner and deposited in his individual checking account. Such company had also issued on December 28, 1946, a check in favor of the corporation in the amount of $3,350. This check was endorsed by the petitioner and was deposited in January 1947, by him in his savings account. Connecticut Web & Buckle Co. - In 1947 this company drew a check in favor of the corporation in the amount of $21.40 which was endorsed by the petitioner and deposited by him in the checking account of Putnam Realty Co., Inc. Walter Griffith Co. - This is a carryover from 1946. In 1947 this company drew a check in payment of the amount of $3,500 which *239 was endorsed by the petitioner and deposited in his individual checking account. Stephen Cochiss - In 1947 two checks totaling $6,500 were issued in payment for this job which were endorsed by the petitioner and deposited by him in his individual checking account. In adidtion, the petitioner received in 1947 currency in the aggregate amount of $3,700 in payment for this job. Louis Lebenthal/Lebenthal and Company - This is a carryover from 1946. In 1947 this company issued a check in favor of the corporation in the amount of $3,270.32 which was endorsed by the petitioner and deposited in his individual checking account. John Moore Convalescent Home - This is a carryover from 1946. Marie Osso - In 1947 Marie Osso $225paid in currency to the petitioner. Patrick and Pearl Panuzio - In 1947 Pearl Panuzio drew two checks in payment for this job, one in the amount of $200 payable to the corporation and one in the amount of $5,000 payable to the petitioner, both of which were deposited by the petitioner in his individual checking account. Also, in 1947 Pearl Panuzio endorsed a check in the amount of $5,000 given to her by a third party in her favor and delivered it to the petitioner who deposited *240 it in a savings account maintained by the two individual petitioners. In addition the petitioner received in 1947 currency in the amount of $800 in payment for this job. Clifford P. Sherman - A part of the consideration paid by Sherman for this job was a mortgage note in the amount of $18,000 made payable to the petitioner individually and secured by a mortagge on the property involved. Armen Wollner - In 1947 the petitioner received $23.14 in currency in payment for this job. Edward Demovick - The receipts from this job represented costs, plus 10% profit. In 1947 the petitioner received $7,802.96 in currency in payment for this job. A part of the consideration paid by Domovick for this job was a mortgage note in the amount of $9,000 made payable to the petitioner individually and secured by a mortgage on the property involved. Antonio Rendo - In 1947 Rendo endorsed a check in the amount of $12,148.99 given to him by a third party in his favor and delivered it to the petitioner who deposited it in his individual checking account. However, of this amount $4,887.88 was refunded to Rendo. Sam Sobel - In 1947 Sobel drew a check in the amount of $970.83 in favor of the petitioner, who cashed *241 it. In 1947 the individual petitioners drew checks on their personal bank accounts in the amount of $4,509 in favor of third parties on behalf of the corporation. This amount was not claimed by the corporation in its income tax return as a part of cost of operations, but in the notice of deficiency the respondent increased cost of operations by that amount. In 1947 the corporation had operating costs, in adidtion to those allowed by the respondent, of $42,000. Individuals - Taxable year 1947 In their joint income tax return for the taxable year 1947 the individual petitioners reported net income of $4,002.65, and tax liability of $589.55. As a result of the revenue agents' investigations, the respondent in the notice of deficiency determined their net income to be $76,037.80. Petitioners did not report as income any corporate funds diverted. Among the items added by the respondent to reported net income was the amount of $63,190.84 which he determined to be corporate income diverted by the individual petitioners to their own use. During the taxable year 1947 the petitioner deposited checks totaling $31,324.18 to the bank account of the corporation. Of this amount $15,500 constituted *242 funds transferred from the petitioner's bank account and the rest consisted of checks received by the individual petitioners from third parties representing rental income, interest income, profits on sales of property, return of capital receipts, salary of both the individual petitioners, and lease deposit receipts. In computing the net amount of corporate income so diverted, the respondent credited all the amounts hereinabove mentioned which were paid by the individuals to the corporation or on its behalf, and, in addition, an amount of $850 expended by them for the purchase of equipment for the corporation and an amount of $2,000 as "Payment of loan and advance Fund." [2] The individual petitioners also made currency payments in 1947 on behalf of the corporation in the amount of $4,000. The net amount of corporate receipts diverted to the use of the individual petitioners in 1947 *243 was $59,190.84. The respondent also added to the reported net income for 1947 an amount of $1,279.16 which he determined represented income of Putnam Realty Co., Inc., diverted by the individual petitioners to their own use. In 1947 the Rent Control Board had granted Putnam Realty Co., Inc., an increase of 5% in the rental which it charged on its apartments. This amount of $1,279.16 represented such rental increase for the remainder of the year 1947. In addition, the petitioner diverted to himself the rental increase in the taxable years 1948, 1949, 1950, and 1951 up to March of that year, in the respective amounts of $3,585.21, $4,045.12, $4,267.95, and $685.90. These additional rentals were not shown on the books and records of Putnam Realty Co., Inc. Neither Putnam Realty Co., Inc., nor the petitioner reported these rental receipts as taxable income for any of these years. [3] The records of Putnam Realty Co., Inc., did not reflect any loans outstanding to the petitioner. In 1947, and thereafter, Adiletta did some accounting work for Putnam Realty Co., Inc., and customarily the petitioner gave him lists of rents received by such company. However, not until after the investigation *244 was started did the petitioner advise Adiletta of the 5% increase in rentals granted in 1947. The apartments owned by Putnam Realty Co. Inc., which gave rise to this rental income had been constructed in 1942, or [*] by Patsy Frank, Inc., under contract with Putnam Realty Co. Patsy Frank, Inc., had subcontracted the plumbing work to Anthony J. Battistelli. Putnam Realty Co., Inc., was unable to pay Patsy Frank, Inc., the full amount due for the construction and Patsy Frank, Inc., in turn did not pay Battistelli the full amount of his charges, there remaining at July 25, 1942, an unpaid balance due Battistelli, including interest, of $12,212.32. Further interest became due later to Battistelli in the amount of $306.37. The individual petitioners undertook to pay the liability to Battistelli. In partial payment of the amount due Battistelli, petitioner Anna DiZenzo gave to Battistelli in 1942 a check in the amount of $2,000 and in 1943 she quitclaimed the family home to him, the deed bearing Federal documentary stamps of $6.60. In 1943, the petitioner gave Battistelli two *245 promissory notes totaling $2,000 which were paid in that year. The appropriations by the petitioner of the rental increases in the years 1947 through 1951 did not constitute payments on any loan owing by that company to the petitioners. The amounts appropriated constituted corporate receipts diverted by the petitioner to his own use and benefit. The respondent determined that the petitioners omitted from their return capital gains of $2,683.73. It has been stipulated that the amount of taxable capital gains which was omitted was $2,005.06. The respondent determined, and it is stipulated, that the individual petitioners failed to report interest income in the amount of $637.88. The respondent determined, and it is stipulated, that the petitioner failed to report a taxable commission of $475. In their return for the taxable year 1947 the petitioners claimed itemized deductions totaling $1,076.30. Included in the claimed deductions, as was true with respect to the taxable year 1946, was an amount of $625 claimed as interest on a mortgage. The respondent, as he did in 1946, disallowed this claimed deduction for lack of substantiation and accordingly allowed the standard deduction of $500 *246 in lieu of any itemized deductions. In their return for the taxable year 1947 the petitioners had included as gross rental received from the 3 stores at Pearl and Main Streets the amount of $5,040, which was offset by depreciation and other expenses totaling $3,296.92, which included $750 claimed as interest paid on a mortgage on the property. The net profit reported from rents was $1,743.08. The amount of the interest paid in 1947 was only $7.76. The respondent determined, and it is stipulated, that the petitioners failed to report taxable rental income in the amount of $3,192.24. Corporation - Taxable year 1948 The following tabulation shows the gross receipts, operating costs, operating profits, deductions, and net income as reported by the corporation in its income tax return for its taxable year 1948 and such items as redetermined by the respondent: Reported
As Adjusted by
Per Return
the Respondent
Gross Receipts
$97,316.30
$158,321.69
Operating Costs
90,047.01
98,022.98
Operating Profit
7,269.29
60,298.71
Deductions
6,391.09
5,758.15
Net Income
878.20
54,540.56 The corporation reported tax liability of $184.42. During the taxable year 1948 the corporation received the following gross receipts *247 for services rendered: M. Baz
$ 15,000.00 *
Bonnie Blair Shops, Inc.
936.00 *
California Oil Marketeers
6,482.98 *
Chemical Plating Company
336.88 *
Agatha Camaro (Rose DeLuca)
2,536.00
Frank Corso
2,400.00 *
Louis DiZenzo
3,880.91 **
Louis S. Fox
1,829.50 *
P. Gottenfield
850.00
Pheilee Gumbus
3,940.84
Eliza Martucci
5,970.00 *
Moore Convalescent Home
680.47 *
Patrick and Pearl Panuzio
600.00
Putnam Realty Co.
2,800.00 **
Arthur Sylvester
143.11 **
Thomas Venezia
1,800.00
Leonard Verrilli
100.85 *
M. Barash
13,000.00
Ernest Cozza, Jr.
37,500.00
Antonio Rendo
16,972.87
Santben Properties, Inc.
29,087.94
R. Zielinski
1,850.00 **
Patsy F. and Anna DiZenzo
(East Main St. store addition)
9,623.00 **
$158,321.35
In reporting gross receipts of $97,316.30 in its return for the taxable year 1948, the corporation did not identify the jobs involved. Nor are Adiletta's work sheets or any other lists available to identify the reported gross receipts on a job-by-job basis. The 1948 jobs will be considered in the order in which they appear in the above tabulation. M. Baz - The consideration paid by M. Baz for this job was a mortgage note in the amount of $15,000 made payable to the corporation and secured *248 by a mortgage on the property involved. This mortgage note was assigned by the corporation to the petitioner in 1949, at which time the remaining balance thereof was $14,100. In 1949, prior to such assignment, Baz had issued checks in the total amount of $520.83 representing payments on the principal and interest, which checks were cashed by the petitioner. California Oil Marketeers - This is a carryover from 1947 Chemical Plating Company - This is a carryover from 1946. Louis DiZenzo - In 1948 Louis DiZenzo paid $3,880.91 in cash to the petitioner. Pheilee Gumbus - This is a carryover from 1947. In 1948 Gumbus drew a check in favor of the petitioner in the amount of $2,740.84 which the petitioner endorsed and deposited in his individual checking account. In the same year Gumbus issued two other checks in partial payment for this job in the total amount of $1,200 which were received by the petitioner and deposited in his individual checking account. Eliza Martucci - In 1948 Eliza Martucci drew a check in favor of the petitioner in the amount of $5,600 which he endorsed and deposited in the checking account of petitioner Anna DiZenzo. John Moore Convalescent Home - This is a carryover *249 from 1946 and 1947. During 1948 the petitioner received in partial payment for this job a check in the amount of $355.08 which he cashed. Patrick and Pearl Panuzio - This is a carryover from 1947. Putnam Realty Co., Inc. - In 1948 the petitioner received a check from Putnam Realty Co., Inc., in the amount of $126.15 for work performed by the corporation which he deposited in the checking account of Putnam Realty Co., Inc. Thomas Venezia - In 1948 the petitioner received a check from Thomas Venezia in the amount of $528.67 which he deposited in the checking account of Putnam Realty Co., Inc., In the same year he also received an amount of $1,271.33 in cash from Thomas Venezia. Leonard Verrilli - This is a carryover from 1947. M. Barash - The petitioner performed this job as a subcontractor of Barash. In 1948 Barash issued two checks in favor of the corporation totaling $13,000, which were endorsed by the petitioner and deposited in his individual checking account. Ernest Cozza, Jr. - The corporation entered into a contract with Cozza in 1948 to perform this job for a fixed price of $38,000 and then subcontracted the job in its [*] to Tarinelli Construction Company for a price of $35,500. *250 Of the total contract price the corporation received $37,500 in 1948. In 1948 Cozza drew a check in favor of the corporation in the amount of $5,000 in partial payment of the contract price on this job. This check was endorsed by the petitioner and deposited in his individual checking account. In 1948 Cozza also executed a mortgage note in the amount of $20,000 in favor of the petitioner in partial payment of the amount due under the contract. Antonio Rendo - This is a carryover from 1946 and 1947. On February 18, 1948, Rendo drew a check for $7,000 in favor of the petitioner which he received and deposited in his individual checking account on February 18, 1948. In 1948 Rendo drew another check in the amount of $2,500 in favor of the petitioner who received it and deposited it in his individual checking account. Santben Properties, Inc. - The corporation contracted for this job at a price of approximately $100,000. During the process of construction the corporation received payments on the basis of percentage of completion of the work, receiving the amount of $29,087.94 in 1948. Thereafter, at a time not disclosed, a controversy arose and the corporation ceased work on the project. *251 The job was completed by another contractor employed by Santben Properties, Inc. At some time thereafter, at a time not disclosed, conferences were held by attorneys and representatives of the corporation and of Santben Properties, Inc., with respect to any further amounts due the corporation, at which time the corporation submitted statements as to costs incurred. However, no further amount was paid to the corporation by Santben Properties, Inc. At some time, not disclosed, Santben Properties, Inc., brought suit against the corporation and the petitioner for failure to complete the contract. The controversy was ultimately settled out of court. The time of settlement is not shown calthough it was subsequent to the year 1948) and the terms of settlement are not shown. In 1948 Santben Properties, Inc., endorsed a check in the amount of $6,104.70 over to the corporation. This check was endorsed by the petitioner and was deposited in his individual checking account. R. Zielinski - In 1948 a check in the amount of $750 was drawn in favor of the corporation in partial payment for this job. The check was received by petitioner and deposited by him in the checking account of Putnam Realty *252 Co., Inc. In 1948 another check in the amount of $600 was drawn in partial payment for this job which was cashed by the petitioner. In 1948 the corporation endorsed over to Tarinelli Construction Company in partial payment of the amount owing that company on subcontract work 4 checks totaling $5,500, which the corporation had received from Ernest Cozza, Jr. This amount was not claimed by the corporation in its income tax return as a part of cost of operations, but in the notice of deficiency the respondent increased the cost of operations by that amount. In 1948 the individual petitioners drew checks on their personal bank accounts in the amount of $2,475.97 in favor of third parties on behalf of the corporation. This amount was not claimed by the corporation in its income tax return as a part of cost of operations, but in the notice of deficiency the respondent increased cost of operations by that amount. In 1948 the corporation had operating costs, in addition to those allowed by the respondent, of $38,000. Individuals - Taxable year 1948 In their joint income tax return for the taxable year 1948 the individual petitioners reported net income of $11,323.80 and tax liability of $1,924.32. *253 As a result of the revenue agents' investigations, the respondent in the notice of deficiency determined their net income to be $84,794.78. Petitioners did not report as income any corporate funds diverted. Among the items added by the respondent to reported net income was the amount of $49,174.50 which he determined to be corporate income diverted by the individual petitioners to their own use. During the taxable year 1948 the petitioner deposited checks totaling $28,630.21 to the bank account of the corporation. Of this amount $22,200 constituted funds transferred from the petitioner's bank account, and the rest consisted of checks received by the individual petitioners from third parties representing rental income, interest income, profits on sales of property, return of capital receipts, salary of both the individual petitioners, and Putnam Realty Co., Inc., receipts. In computing the net amount of corporate income so diverted, the respondent credited all the amounts hereinabove mentioned which were paid by the individuals to the corporation or on its behalf. [4] *254 The individual petitioners also made currency payments in 1948 on behalf of the corporation in the amount of $3,000. The net amount of corporate receipts diverted to the use of the individual petitioners in 1948 was $46,174.50. The respondent also added to the reported net income for 1948 an amount of $3,585.21 which he determined represented income of Putnam Realty Co., Inc., diverted by the individual petitioners to their own use. As in the case of amounts received in the year 1947, the amount of $3,585.21 received by the petitioner in 1948 from Putnam Realty Company, Inc., constituted corporate receipts diverted by the petitioner to his own use and benefit. The respondent also added to the reported net income for 1948 an amount of $2,276.35 as net gain from sale of capital assets. The respondent also added to the reported net income for 1948 an amount of $14,793.72 derived from the sale in 1948 to Mendel Hillman for $49,677.57 (part of a sale involving a total price of $85,000) of certain new store *255 buildings located at East Main and Pearl Streets, which had a cost of $34,883.85. He determined that these particular additions had not been held for more than 6 months, and that, therefore, the full amount of gain constituted taxable income. The construction of these new buildings at East Main and Pearl Streets was 90% complete at the end of 1947. The respondent determined, and it is stipulated, that the petitioners failed to report interest income in the amount of $252.28. In their return for the taxable year 1948 the petitioners claimed itemized deductions totaling $1,257.80. Included in the claimed deductions was an amount of $750 claimed as interest on a mortgage on their personal home. The respondent disallowed this claimed deduction of $750 for lack of substantiation. He accordingly allowed the standard deduction of $1,000 in lieu of any itemized deductions. In their return for the taxable year 1948 the petitioners had included as gross rental received from the stores located at Pearl and Main Streets the amount of $3,900 which was offset by depreciation, repairs, and other expenses totaling $2,686.03, which included $375 claimed as interest paid on a mortgage on this property. *256 The net profit from rents was reported as $1,213.97. The amount of interest paid in 1948 was only $3.88. The respondent determined, and it is stipulated, that the petitioners failed to report taxable rental income in the amount of $3,131.12. Corporation - Taxable year 1949 The following tabulation shows the gross receipts, operating costs, operating profit, deductions, and net income as reported by the corporation in its income tax return for its taxable year 1949 and such items as redetermined by the respondent. As Adjusted
Reported
By the
Per Return
Respondent
Gross Receipts
$25,498.53
$36,148.93
Operating Costs
20,841.17
27,532.83
Operating Profit
4,657.36
8,616.10
Deductions
4,375.89
4,416.39
Net Income
281.47
4,199.71
The corporation reported tax liability of $59.12. The following tabulation shows gross receipts of the corporation from jobs performed in 1949, together with the amounts thereof included by the corporation in its return, and the amounts not reported in its return: Amts. Included
Amts. Unreported
Gross Receipts
by Corp.
(or over-reported)
of the Corp.
in Return
by Corp.
Capozzi & Rodia
$18,997.00 * *257 $16,177.34
$ 2,819.66
Oscar Chapootian
1,100.00
1,313.54
(213.54)
John Schiller
43.50 **
43.50
L. Verrilli
6,500.00 *
7,697.85
(1,197.85)
Max Hilliman
82.00
82.00
J. Cuneo
21.40
21.40
C. Christenson
12.90 **
12.90
Patrick & Pearl Panuzic
150.00
150.00
Sam Genova
4,547.59 **
4,547.59
Putnam Realty Company
315.00 **
315.00
M. Barash
2,551.54
2,551.54
Ernest Cozza, Jr.
962.00
962.00
Antonio Rendo
253.00
253.00
R. Zielinski
75.00 **
75.00
$35,610.93
$25,498.53
$10,112.40
The 1949 jobs will be considered in the order in which they appear in the above tabulation. Capozzi & Rodia - The list contained in Adiletta's work sheets shows the total amount of gross receipts from this job in 1949 as $16,177.34. A part of the consideration received from this job consisted of a mortgage note of $10,000. In the $10,000 mortgage note the petitioner was named as the payee. In 1949 Capozzi drew a check in the amount of $3,000 in favor of the petitioner, who deposited it in his individual checking account. In the same year Capozzi and Rodia drew a check in the amount of $265 in favor of the petitioner who endorsed and deposited it in the checking account of Putnam Realty Co., Inc. In the same year they drew another check in the amount of $600 which the petitioner cashed. In the same year Capozzi endorsed over to the petitioner the check of a third party in the amount of $4,000, which was deposited by the petitioner in his individual checking account. Oscar Chapootian - In 1949 Rose Chapootian drew a check in the amount of $200 in favor of the petitioner who deposited it in the checking account of Putnam Realty Co., Inc. In the same *258 year another check in the amount of $400 was issued in partial payment for this job which was cashed by the petitioner. L. Verrilli - In 1949 Anna Verrilli drew 3 checks in the aggregate amount of $6,500 in favor of the petitioner who deposited them in his individual checking account. Sam Genova - The list contained in Adiletta's work sheets does not include any gross receipts from this job. In 1949 Genova executed a mortgage note in the amount of $11,000 in which the petitioner was named as payee. This was a construction mortgage and the security securing the note was increased according to the completion of the building. The corporation or the petitioner became entitled to only $4,547.59 in 1949. In the following year the corporation or the petitioner became entitled to $6,437.32. Putnam Realty Co., Inc. - The list contained in Adiletta's work sheets does not include any gross receipts from this job. M. Barash - This is a carryover from 1948. The list contained in Adiletta's work sheets does not include any gross receipts from this job. Ernest Cozza, Jr. - This is a carryover from 1948. The corporation received from Cozza in 1949 a check for $1,500. The respondent in computing the *259 deficiency included in gross receipts for 1949 from this job the full amount of $1,500. However, only $500 of such $1,500 check represented payment on the contract price. The remaining $1,000 represented principal and interest paid on the $20,000 mortgage note given by Cozza in 1948 as partial payment of the contract price. Of such $1,000, $462 represented interest taxable to the corporation in 1949, and $538 represented a payment on the principal of such mortgage. Neither the corporate return for 1949 nor the list of receipts contained in Adiletta's work sheets included as gross receipts or taxable income any portion of the $1,500 check. Antonio Rendo - This is a carryover from jobs performed in 1946 and 1947. The list contained in Adiletta's work sheets for 1949 does not include any gross receipts from this job. In the year 1949 a check in the amount of $253 was drawn in final payment for these jobs which was deposited in the individual checking account of the petitioner. R. Zielinski - This is a carryover from 1948. The list contained in Adiletta's work sheets does not include any gross receipts from this job. In 1949 the individual petitioners drew checks on their personal bank *260 accounts in the amount of $6,691.66 in favor of third parties on behalf of the corporation. This amount was not claimed by the corporation as a part of cost of operations in its income tax return, but in the notice of deficiency the respondent increased cost of operations by that amount. Individuals - Taxable year 1949 In their joint income tax return for the taxable year 1949 the individual petitioners reported net income of $7,098.51 and tax liability of $1,031.56. As a result of the revenue agents' investigations, the respondent in the notice of deficiency determined their net income to be $24,534.65. Petitioners did not report as income any corporate funds diverted. Among the items added by the respondent to reported net income was the amount of $8,145.23 which he determined to be corporate income diverted by the individual petitioners to their own use. Included in the computation is the Baz mortgage note at $14,100 and payments of $520.83 by Baz to the petitioner. See explanation under corporate year 1948. During the taxable year 1949 the petitioner deposited cash of $171.75 and checks totaling $7,563.34 to the bank account of the corporation. Of the amount deposited by check *261 $4,450 constituted funds transferred from the petitioner's bank account, and the rest consisted of checks received by the individual petitioners from third parties representing rental income, interest income, return of capital, receipts, and salary. In computing the net amount of corporate income diverted, the respondent credited all the amounts hereinabove mentioned which were paid by the individuals to the corporation or on its behalf and, in addition, an amount of $10,864.44 expended by them in payment of corporate expenses and an amount of $11,000 as "Payment of loan and advance Fund." The net amount of corporate receipts diverted to the use of the individual petitioners in 1949 was $7,607.23. This figure reflects a credit of $538 (being the part of the check for $1,500 given to the corporation which represents payment on the principal of the $20,000 mortgage which was included in diversions for 1948). The respondent also added to the reported net income for 1949 an amount of $4,045.12 which he determined represented income of Putnam Realty Co., Inc., diverted by the individual petitioners to their own use. As in the case of amounts received in the years 1947 and 1948, the amount *262 of $4,045.12 received by the petitioner in 1949 from Putnam Realty Co., Inc., constituted corporate receipts diverted by the petitioner to his own use and benefit. The respondent determined that the individual petitioners in 1949 received additional net gains from the sale of capital assets in the amount of $4,333.70. It has been stipulated that in 1949 the individual petitioners sold land and buildings at East Main Street to Mendel Hillman (not related to sale to Hillman in 1948) for a price of $12,500 which they did not report in their return for 1949. The respondent determined, and it is stipulated, that the individual petitioners failed to report interest income in the amount of $846.83. In their return for the taxable year 1949 the individual petitioners claimed itemized deductions totaling $1,265.26. Included in the claimed deductions was an amount of $750 claimed as interest on a mortgage. The respondent disallowed this claimed deduction of $750 for lack of substantiation. He accordingly allowed the standard deduction of $1,000 in lieu of any itemized deductions. Corporation - Taxable year 1950 The following tabulation shows gross receipts, operating costs, operating prfoit, *263 deductions, and net income as reported by the corporation in its income tax return for its taxable year 1950, and such items as redetermined by the respondent: As Adjusted
Reported
by the
Per Return
Respondent
Gross Receipts
$9,394.78
$19,790.67
Operating Costs
8,060.82
13,310.61
Operating Profit
1,333.96
6,480.06
Deductions
1,439.03
960.02
Net Income
(105.07)
5,520.04 The corporation reported no tax liability. The following tabulation shows gross receipts of the corporation from jobs performed in 1950, together with the amounts thereof included by the corporation in its return, and the amounts not reported in its return: Amounts
Included
Amounts
Gross Receipts
by Corp.
Unreported
of the Corp.
in Return
by Corp.
Capozzi and Rodia
$ 1,050.27 *
$1,050.27
Oscar Chapootian
200.00
200.00
Sam Genova
6,437.32 **
6,437.32
Joseph Pagano
5,300.00
$5,300.00
L. Verrilli
1,500.00 *
1,400.00
100.00
Patrick and Pearl Panuzio
359.18
359.18
Putnam Realty Co.
189.90 **
35.60
154.30
First National Bank
67.00
67.00
$15,103.67
$7,094.78
$8,008.89
The 1950 jobs included in the tabulation will be considered in the order in which they appear above. Capozzi and Rodia - This is a carryover from 1949. The list contained *264 in Adiletta's work sheets does not include any amount as gross receipts from this job. In 1950 Capozzi and Rodia drew a check in the amount of $100 in favor of the petitioner who deposited it in his individual checking account. In the same year Louis Capozzi drew a check in the amount of $950.27 in favor of the petitioner who cashed it. Oscar Chapootian - This is a carryover from 1949. The list contained in Adiletta's work sheets does not include any amount as gross receipts from this job. In 1950 Rose Chapootian drew a check in favor of the petitioner in the amount of $200 which the petitioner cashed. Sam Genova - This is a carryover from 1949. The list contained in Adiletta's work sheets does not include any amount as gross receipts from this job. Joseph Paganno - The amount of gross receipts from this job did not exceed the stipulated amount of $5,300. In 1950 the petitioner received currency payments of $5,300 from Pagano. L. Verrilli - This is a carryover from the 1949 job. The list contained in Adiletta's work sheets shows gross receipts in 1950 from this job of $1,400. In 1950 two checks were received by the petitioner in payment for this job, one in the amount of $300 which *265 the petitioner deposited in his individual checking account, and one in the amount of $1,200 which the petitioner cashed. Patrick and Pearl Panuzio - This is a carryover from the 1947 job. Putnam Realty Co., Inc. - The list contained in Adiletta's work sheets reflects the gross receipts from this job in 1950 as being $35.60. The petitioner received a check in the amount of $154.30 from Putnam Realty Co., Inc., which he deposited in his individual checking account. The respondent in determining the amount of gross receipts for 1950 included an amount of $67 as having been received from First National Bank for a small job done in 1949. The list contained in Adiletta's work sheets for 1949 showed an unpaid balance of $67 owing on such job. In 1950 the individual petitioners drew checks on their personal bank accounts in the amount of $6,940.26 in favor of third parties on behalf of the corporation. This amount was not claimed by the corporation as a part of cost of operations. In the notice of deficiency the respondent increased cost of operations by $5,249.79 of this amount. Individuals - Taxable year 1950 In their joint income tax return for the taxable year 1950 the individual petitioners *266 reported net income of $6,130.36 and tax liability of $882.26. As a result of the revenue agents' investigations, the respondent in the notice of deficiency determined their net income to be $19,432.07. Petitioners did not report as income any corporate funds diverted. Among the items added by the respondent to reported net income was the amount of $8,630.22 which he determined to be the net amount of corporate income diverted by the individual petitioners to their own use. In arriving at the net amount of diversions the respondent included in his calculation the items which we have hereinabove enumerated as having been diverted and, in addition, other amounts diverted consisting of insurance refunds due the corporation in the total amount of $527.01 and an amount of $2,300 representing proceeds from the sale by the corporation of its equipment to the petitioner's son. Of the insurance refunds $387.14 was deposited in the bank account of Putnam Realty Co., Inc., and $139.87 was deposited in the checking account of the petitioner Anna DiZenzo. The check for $2,300 was cashed by the petitioner. The respondent in his calculation included as income diverted an amount of $9,987 which he *267 determined represented cash paid by Joseph Pagano in that year to the petitioner. However, the amount of cash which Pagano paid was only $5,300. During the taxable year 1950 the petitioner deposited cash of $30 to the bank account of the corporation. In computing the net amount of corporate income diverted, the respondent credited all the amounts hereinabove mentioned which were paid by the individual petitioners to the corporation or on its behalf and, in addition, an amount of $6,555.42 expended by the individual petitioners in payment of corporate expenses. The net amount of corporate receipts diverted to the use of the individual petitioners in 1950 was $3,943.22. The respondent also added to the reported net income for 1950 an amount of $4,267.95 which he determined represented income of Putnam Realty Co., Inc., diverted by the individual petitioners to their own use. As in the case of amounts received in the years 1947, 1948, and 1949 the amount of $4,267.95 received by the petitioner in 1950 from Putnam Realty Co., Inc., constituted corporate receipts diverted by the petitioner to his own use and benefit. The respondent determined, and it is stipulated, that the individual petitioners *268 failed to report interest income in the amount of $1,217.86. In their return for the taxable year 1950 the individual petitioners claimed itemized deductions totaling $1,470.18. Included in the deductions was an amount of $750 claimed as interest on a mortgage. The respondent disallowed this claimed deduction of $750 for lack of substantiation. He accordingly allowed the standard deduction of $1,000 in lieu of any itemized deductions. Individuals - Taxable year 1951 In their joint income tax return for the taxable year 1951 the individual petitioners reported net income of $9,054.87 and tax liability of $1,679.50. As a result of the revenue agents' investigations, the respondent in the notice of deficiency determined their net income to be $9,503.24. The respondent added to the reported net income for 1951 the amount of $685.90 which he determined represented income of Putnam Realty Co., Inc., diverted by the individual petitioners to their own use. As in the case of amounts received in the years 1947, 1948, 1949, and 1950, the amount of $685.90 received by the petitioner in 1951 from Putnam Realty Co., Inc., constituted corporate receipts diverted by the petitioner to his own use *269 and benefit. In their return for the taxable year 1951 the individual petitioners claimed itemized deductions totaling $1,636.02. Included in the claimed deductions was an amount of $562.50 claimed as interest on mortgages which the respondent disallowed for lack of substantiation. Fraud and Statute of Limitations The corporation filed its income tax returns for the taxable years 1946, 1947 and 1948 not later than the respective dates of March 5, 1947, February 27, 1948, and January 11, 1949. The notices of deficiency for those taxable years were mailed to the corporation on January 22, 1958. No consents in writing were entered into between the respondent and the corporation extending the time prescribed in section 275 of the Internal Revenue Code of 1939 for the assessment and collection of income taxes for those years. Consents in writing were entered into between the respondent and the corporation extending the time for assessment and collection of taxes for the taxable years 1949 and 1950 until June 30, 1958. The individual taxpayers filed their joint Income tax returns for the taxable years 1946, 1947, 1948, 1949, and 1950 on, or not later than, the respective dates of February *270 28, 1947, February 17, 1948, January 7, 1949, February 11, 1950, and March 15, 1951. The respondent and the individual petitioners entered into consents in writing extending the time for assessment and collection of tax for each of those years, but the time as extended expired prior to January 22, 1958, the date of the mailing of the notices of deficiency in income tax and transferee liability with respect to those years. The individual petitioners filed their joint return for the taxable year 1951 not later than March 15, 1952, Consents in writing were entered into between the respondent and the individual petitioners extending the time for assessment and collection of taxes for that year until June 30, 1958. The notices of deficiency in tax liability and transferee liability were mailed to the individual petitioners with respect to that year on January 22, 1958. The tax returns filed by the corporation for the years 1946, 1947, and 1948 were false and fraudulent with intent to evade tax. A part of the deficiency in tax due from the corporation for each of the years 1946 to 1950, inclusive, is due to fraud with intent to evade tax. The tax returns filed by the individual petitioners *271 for the years 1946 through 1950 were false and fraudulent with intent to evade tax. A part of the deficiency in tax due from the individual petitioners for each of the years 1946 through 1951 is due to fraud with intent to evade tax. Transferee Liabilities The respondent determined that the petitioner Patsy F. DiZenzo received from the corporation without consideration assets in the amount of $248,548.67 during the taxable years 1946 through 1950, inclusive, and that he is liable, as a transferee, for any unpaid taxes and additions to tax due from the corporation for those years. He also determined that the petitioner Anna DiZenzo received without consideration assets from the petitioner Patsy F. DiZenzo in the amount of $137,675 during the taxable years 1949 and 1950, and that she is liable, as a transferee of a transferee, for any unpaid taxes and additions to tax due from the corporation for its taxable years 1946 through 1950. The net amount of corporate receipts diverted by the petitioner Patsy F. DiZenzo to his own use in each year was received by him without consideration. The diversions constituted fraudulent conveyances from the corporation to the petitioner made or contrived *272 with intent to avoid the payment of taxes due from the corporation. The petitioner made the following transfers of cash, without consideration, from his bank account to the bank account of the petitioner Anna DiZenzo: Date
Amount
12/ 9/49
$18,925
12/15/49
22,500
7/28/50
5,000
8/31/50
2,500
On June 7, 1950, the petitioner transferred, without consideration, to the petitioner Anna DiZenzo, the following mortgage notes: Balance Due
Mortgagor
June 7, 1950
Clifford Sherman
$12,900.00
Edward Demovick
1,250.00
Mendel Hillman
42,500.00
Ernest Cozza
15,500.00
Louis (Fred) Capozzi
4,600.00
Sam Genova
11,000.00
Mendel Hillman
11,000.00
$98,750.00
Underestimation of Estimated Tax For the taxable years 1946 through 1951 the individual petitioners filed declarations of estimated tax showing estimated tax in the respective amounts of $190, $200, $187.50, $477, $650, and $650. For each of those years, taxes were withheld in the respective amounts of $330.45, $336, $335, $253.85, $229.75, and $322.05. Miscellaneous Facts Of all of the deposits made to the bank account of the corporation during the years in question, the only amount which consisted of currency, other than those set forth hereinabove, was $25 deposited in 1950. *273 On July 29, 1955, upon his plea of nolo contendere, the petitioner was adjudged guilty by the United States District Court for the District of Connecticut of wilfully attempting to defeat and evade income tax owing by him and his wife for the calendar year 1950 by filing a false and fraudulent joint income tax return, and of attempting to defeat and evade taxes owing by the Putnam Realty Co., Inc., for its fiscal year ended May 31, 1949, by filing a false and fraudulent return for that company. The income tax return of the corporation for the taxable year 1947 was signed by the individual petitioners. Their affidavit contained therein is shown as having been subscribed and sworn to before Adiletta as a notary public on February 16, 1948. Such return was stamped as having been received by the collector of internal revenue with remittance on February 27, 1948. The cash disbursements book of the corporation shows a check disbursement of $68.04 payable to the collector of internal revenue under date of February 17, 1948. On February 2 and 18, 1948, deposits were made to the checking account of the petitioner, including the check for $7,000 from Antonio Rendo drawn in favor of the petitioner *274 and deposited on February 18. The income tax return of the corporation for the taxable year 1948 was signed by the individual petitioners. Their affidavit contained therein is shown as having been subscribed and sworn to before Adiletta as a notary public on January 10, 1949. Such return was stamped as having been received by the collector of internal revenue, with remittance, on January 11, 1949. On January 11, 1949, the petitioner visited his safe deposit box vault at the First National Bank at Bridgeport, Connecticut. The cash disbursements book of the corporation shows a check disbursement of $184.42 payable to the collector of internal revenue under date of January 10, 1949. In early January 1949 disbursments were made by checks from the petitioner's checking account, including one on January 11 in the amount of $604.50 by a check drawn in favor of "Cash". In the corporate returns for the taxable years 1946, 1947, and 1948 the only amounts claimed as deductions on account of officers' salaries were the respective amounts of $300, $450, and $500 claimed as salary paid to the petitioner. In the corporate returns for the taxable years 1949 and 1950 no amounts were claimed as deductions *275 for officers' salaries. In his individual income tax returns for those years the petitioner did not include compensation from the corporation in greater amounts than claimed by the corporation. The corporation had year-end balances in its bank account of $1,641.23 in 1946, $7,813.38 in 1947, $158.42 in 1948, $126.84 in 1949, and $3.13 in 1950. Opinion Deficiencies Determined Against the Corporation Deficiencies in tax determined by the respondent are presumed to be correct and the burden of proof is upon the petitioners to show error therein. Welch v. Helvering, 290 U.S. 111, and Helvering v. Taylor, 293 U.S. 507. The petitioners contend, however, that the respondent's determinations with respect to the corporation are unreasonable and arbitrary and cannot be given any presumptive force, citing among other cases Helvering v. Taylor, supra, and Russell v. Commissioner, (C.A. 1) 45 F. 2d 100. It is their position that among the gross receipts found by the respondent (and substantially agreed to in the stipulation of facts) are receipts from non-profit jobs, jobs performed at cost, plus a specific percentage, and jobs which the corporation entirely subcontracted at a fixed profit, *276 and they argue that if computations are made in which the gross receipts from the non-profit jobs and fixed profit jobs are removed from the respondent's reconstructed gross receipts, and the profits on fixed profit jobs are removed from the over-all net profits determined by the respondent, it will be demonstrated that the ratio of net profit to gross receipts on the remaining jobs is unreasonable and arbitrary. Taxpayers, with exceptions not here material, are required to maintain adequate records from which income subject to tax can be determined. Section 54 of the Internal Revenue Code of 1939; section 29.54-1 of Regulations 111; and Dorothy L. Sutherland, 32 T.C. 862. The corporation kept very few records and these were totally inadequate for the purpose of computing taxable income. Such records contained only a portion of gross receipts and costs. Such costs as were shown in the records cannot be allocated to particular jobs. The revenue agents found it necessary to make exhaustive investigations in order to reconstruct the over-all gross receipts and operating costs. One agent spent 300 working days on the investigation. As a result of the investigations, the respondent in *277 the notice of deficiency determined gross receipts greatly in excess of those reported in the corporate returns. The gross receipts so determined are, with certain exceptions noted in the Findings of Fact and discussed hereinafter, conceded in the stipulation of facts to be correct. The agents also discovered operating costs in excess of those claimed in the returns, and in determining the profits these larger amounts were allowed by the respondent. The respondent also allowed substantially all the deductions claimed in the returns. In arriving at the corporation's tax liability the respondent used the same method of arriving at net income as was used by the corporation in its returns. He determined the amount of gross receipts, reduced them by operating costs in order to determine gross profit, and then allowed deductions in computing net income. This, of course, is the customary manner of arriving at net income subject to tax. As a result of evidence adduced at the trial we have found that the respondent made errors with respect to some individual items in arriving at gross receipts and operating costs. However, it is well settled that the fact that the respondent made errors with *278 respect to certain individual items does not destroy the presumption of correctness of the remainder of his determinations or relieve the petitioners of their burden of proof with respect thereto. Anderson v. Commissioner, (C.A. 5) 250 F. 2d 242, certiorari denied 356 U.S. 950; Commissioner v. Smith, (C.A. 5) 285 F. 2d 91; Clark v. Commissioner, (C.A. 9) 266 F. 2d 698; and Hoffman v. Commissioner, (C.A. 3) 298 F. 2d 784, all of which affirm in whole or in part Memorandum Opinions of this Court. We cannot conclude here that the respondent's determinations were arbitrary or capricious and that they are deprived of the presumption of correctness. Such determinations of the respondent are approved except to the extent that we have concluded that sufficient evidence was adduced by the petitioners to show error therein. As stated, the parties are in agreement with respect to most of the gross receipts. However, there are some items which are in dispute and which will be discussed. Patsy F. & Anna DiZenzo - Office Building at 1286 Kossuth Street - The respondent included in unreported gross receipts for the taxable year 1946 the amount of $22,000 as having been the amount received *279 by the corporation from the individual petitioners for construction of the office building at 1286 Kossuth Street. The petitioners contend that the amount received by the corporation was only $9,000 and that it was a non-profit job. The record is confusing with respect to this item. In the corporate return, despite the fact that the corporation did not own the building, depreciation was claimed with respect thereto, and the cost basis used was $22,000. The work sheets of the accountant, Adiletta, which are attached to the retained copy of the corporate return for the taxable year 1946 contain a notation that the building cost $22,000. Adiletta testified that he noted this cost at the direction of the individual petitioner and that he did not investigate the ownership. In March 1952, the individual petitioner told the revenue agents that the building had cost about $15,000. Thereafter, in a net worth statement dated April 23, 1952, which the petitioners submitted to the Internal Revenue Service, the building and land were listed at a cost of $22,000. At a later conference in June 1953, the petitioner stated to representatives of the Internal Revenue Service that the building had a *280 cost of about $9,000. At a later time he submitted to the Internal Revenue Service a list of materials and labor totaling about $9,000 which he represented as being the cost incurred by the corporation which he reimbursed to the corporation. At the trial the petitioner testified that the cost was about $9,000, and the above-mentioned list was admitted in evidence. He testified that much of the material used was second-hand and that he personally did the greater part of the physical construction, although the corporation furnished some labor. Applications for building permits submitted in evidence showed estimates of the value of the buildings in the aggregate amount of $8,200. The petitioner testified that the $22,000 included in the net worth statement represented value of land and buildings, rather than the cost. The certified public accountant who prepared the net worth statement testified in effect that although there was a question about the cost of the buildings it was decided to include the cost of the land and buildings in the net worth statement at a figure of $22,000 since, being a constant figure, it would not affect the increase in net worth, which was the purpose of submitting *281 the net worth statement. Despite the inconsistencies and contradictions, we have reached the conclusion, upon the basis of all the evidence, that the cost incurred by the corporation in the construction of the buildings was $9,000 and that the individual petitioners paid the corporation only that amount. Accordingly, the respondent in the notice of deficiency overstated gross receipts of the corporation for the taxable year 1946 by the amount of $13,000. Ernest Cozza, Jr. - The record is also quite confusing with respect to this job. The corporation contracted in 1948 to do this job for Cozza for $38,000 and then subcontracted the job in its entirety to Tarinelli Construction Company at a fixed price of $35,500. Cozza actually paid in connection with this job a total of $37,500 in 1948 and $1,500 in 1949, or a total of $39,000. The parties have stipulated to aggregate gross receipts of $39,000 in connection with this job, but not that such receipts constituted business gross receipts. There is considerable testimony with respect to what the additional $1,000 represented. There is testimony that certain extra work was done. Tarinelli testified that he and Cozza contracted for these *282 extras separately without involving the corporation. Cozza also testified that his check book contains a notation that the check for $1,500 which he drew in favor of the corporation in 1949 was for payment of principal, and interest of $462, on the mortgage note for $20,000 which he had executed in favor of the petitioner in 1948 as part of the consideration paid for the job. On brief the petitioners concede that $500 of this payment in 1949 represented payment on the original construction contract. Based upon a consideration of all the evidence we have concluded, and found as a fact, that of the $1,500 paid by check, $500 represented payment on the original contract price and hence business gross receipts, $462 represented taxable interest on the 1948 mortgage, and $538 represented payment of principal of such mortgage. Thus, the respondent erred in his determination of the amount of gross receipts from this job in 1949. Technically only $500 represented gross receipts from the job, but since the $462 of interest represents taxable income to the corporation, we have, for convenience, treated this item as a part of gross receipts (rather than as a separate item of interest income) *283 from this job in 1949. Joseph Pagano - The parties have stipulated that Pagano paid the petitioner $5,300 in cash in connection with this job done by the corporation. The respondent in determining the deficiency included in gross receipts from this job a total amount of $9,987, and on brief he still maintains that that amount was received. There was introduced in evidence a proposal submitted to Pagano by the corporation to do the work called for in certain specifications for $9,987. However, such proposal does not contain an acceptance of the proposal by Pagano. The petitioner testified that this was a remodeling job, that Pagano found that the expense of carrying out the full specifications was too great, and that about one-half of the work called for in the specifications was eliminated. He testified in detail as to the portions of the work originally called for which were not actually done. We are satisfied from the testimony and other evidence that the original contract was not carried out and that the amount of gross receipts from this job did not exceed $5,300. Accordingly, the gross receipts determined by the respondent for the year 1950 are excessive to the extent of $4,687. *284 The petitioners' principal contention is that the respondent did not allow the corporation sufficient aggregate costs of operations. They claim that there were other costs in undetermined amounts paid in currency by the corporation, or by the petitioner on its behalf, which the respondent did not take into account. It is clear that the respondent allowed all costs which the agents were able to verify, these being in excess of the costs claimed in the returns. Neither the corporation nor the petitioner kept a record of costs paid in currency. During the investigation the petitioner told the agents that some costs had been paid in currency, and the agents testified that they inquired of material suppliers and subcontractors whom they contacted as to whether payments had been made by the corporation in currency, but could not verify that currency had been paid. In the circumstances, it was not arbitrary for the respondent to limit his allowance of operating costs to the costs claimed in the returns, plus other costs which he could verify. The burden is upon the petitioners to show greater costs than claimed in the returns and allowed by the respondent. There is no burden on the respondent *285 to prove that the corporation did not have other costs. As stated in United States v. Stayback, (C.A. 3) 212 F. 2d 313, certiorari denied 348 U.S. 911: The crux of the defendant's contention is that the government was charged under the law with the burden of establishing (1) defendant's gross sales were higher than reported; (2) his deductible operating costs; and (3) that his net income (after deduction of his operating costs from gross sales) was in excess of that which he had reported. * * *
It is well settled that once the government establishes unreported income of the defendant and allows deductions claimed by him in his tax return and others that it can calculate without his assistance, the burden is on the defendant to prove that he had other allowable deductions which were not shown in his return: United States v. Smith, 3 Cir., 1953, 206 F. 2d 905; United States v. Link, 3 Cir., 1953, 202 F. 2d 592; United States v. Hornstein, 7 Cir., 1949, 176 F. 2d 217. The government is not required to prove the negative, i.e., that the defendant did not have any other deductions. Gariepy v. United States, 6 Cir., 1951, 189 F. 2d 459. And in United States v. Bender, (C.A. 7), 218 F. 2d 869, *286 certiorari denied 349 U.S. 920, it was stated: The taxpayer's costs and other factors which would lessen his tax liability are peculiarly within his own knowledge. Accordingly, the law has placed upon him the burden of going forward with the evidence once the Government has established receipts in excess of those reported in his income tax return. As this court said in United States v. Hornstein, 7 Cir., 176 F. 2d 217, 220: "The figures of cost of goods sold, as they were used in preparing his tax returns, were at least admissions by the defendant which the government could utilize in making a prima facie case. The defendant was chargeable with them until he offered credible evidence to show that the figures were in error, and that his costs were greater." Except with respect to a few jobs, the petitioners have not shown the amount of costs incurred or the amount of profit derived by the corporation. They have not shown any specific payments of expenses in currency. [5] *289 The petitioner testified with respect to each job from which gross receipts were determined by the respondent, and in some instances the corporation's customer testified. With the exception of a few jobs which he stated *287 he did not recall, the petitioner testified as to the percentage of profit the corporation had estimated in making each contract as well as the percentage of profit which was derived. He stated that prior to testifying he had referred to a document containing information about the various jobs which he stated had been compiled by him in June 1957 from memory, and on occasion he referred to this document in testifying at the trial. He further stated that prior to the hearing he had revisited most of the jobs to try to refresh his recollection. He stated that in some instances his testimony as to the percentage of profit differed from the percentage of profit shown on such document because at the time the document was prepared he did not remember what the percentage arrangement was. He further stated that his testimony was based on "what I would assume would be the profit and what I thought it was after I visited the job, for a job that size." It is obvious that, with the exception of some particular jobs which he had a particular reason to recall, his testimony as to percentages of profit made represented guesses or estimates rather than definite recollections. We therefore cannot, *288 except in a few instances, accept the petitioner's testimony as a basis for establishing the amount of costs and profit on any particular job. It is impossible from this record to determine the profit on a job by job basis or to fix with precision the aggregate amount of the costs incurred by the corporation, but we think the record as a whole shows that for some of the years there must have been costs of operations greater than claimed by the corporation in its returns and greater than found by the respondent. In reaching this conclusion we have carefully examined the voluminous evidence concerning the various jobs, including the testimony of the petitioner with regard thereto and his general testimony as to the amount of profit which was usually projected in submitting bids for the corporation.[6] We have also taken into account the testimony of the petitioners' witness, a professional cost consultant, as to average profits made by building contractors in the Bridgeport area during the years in question.[7] *291 We have exercised our best judgment and made findings of additional operating costs for each of the years 1946, 1947, and 1948, bearing heavily upon the petitioners upon *290 whom rests the burden of proof and whose inexactitude is of their own making. Cohan v. Commissioner, (C.A. 2) 39 F. 2d 540. See Pleason v. Commissioner, (C.A. 7) 226 F. 2d 732, affirming 22 T.C. 361, certiorari denied 350 U.S. 1006, and Nathan Goldsmith, 31 T.C. 56. In arriving at our conclusions we have taken into account the stipulated non-profit jobs as well as certain other jobs which we have concluded from the evidence were non-profit jobs. The petitioners contend that the following jobs were non-profit jobs, in addition to those that were stipulated to be non-profit: Rendo, Berman, Patsy F. and Anna DiZenzo (office building at 1286 Kossuth Street), commenced in 1946; Rendo, and Patsy F. and Anna DiZenzo (East Main Street store addition), commenced in 1947; Sylvester, Santben Properties, Inc., and Zielinski, commenced in 1948; and Schiller, Christenson, and Panuzio, commenced in 1949. We have accepted the petitioner's testimony that the following transactions were not intended to result in a profit and in fact did not: Berman, Patsy F. and Anna DiZenzo (office building at 1286 Kossuth Street), Patsy F. and Anna DiZenzo (East Main Street store addition), Sylvester, Zielinski, Schiller, and Christenson. The Rendo, Santben, and Panuzio transactions were entered into for profit, and we cannot conclude that they did not in fact result in profit. They are discussed below. Antonio Rendo - It has been *292 stipulated that the corporation had gross receipts in the taxable years 1946, 1947, 1948, and 1949 in the respective amounts of $9,000, $21,216.75, $16,972.87, and $253 from the Rendo transactions which involved construction and sale of a house on Brook Street and two houses on Kossuth Street. The petitioner testified that the corporation had an arrangement whereby it and Rendo would jointly build these houses, the corporation furnishing some of the material and labor, and divide any profit on the sales of the houses on a 50-50 basis. In his deposition Rendo stated that he was a mason employed by the petitioner or the corporation; that the lots upon which the houses were built belonged to him; that the corporation did not share in the Brook Street transaction except to furnish him materials and labor at cost; that on the Kossuth Street houses the profit was to be split 50-50, but that any loss was to be borne by him and not by the corporation; and that the 3 houses were sold for a total of $52,250. In view of the conflict between the testimony of the petitioner and Rendo, we cannot reach a conclusion as to precisely what the contractual arrangements were. The testimony of each is to *293 the effect that all costs were recovered but that no profit was made. It does not seem probable that the amount of $52,250 received from the sales of the properties would precisely equal the costs incurred by both parties. Neither the petitioner nor Rendo attempted to prove the amounts of cost expended. In these circumstances we cannot conclude that these were non-profit jobs. Santben Properties, Inc. - The petitioner testified that the $29,087.94 received in 1948 on this job represented only a partial reimbursement of costs expended prior to termination of work on the uncompleted building. He testified that in conferences with representatives of Santben Properties, Inc., he presented a list and invoices showing costs incurred of about $32,000. Charles Santini, secretary and treasurer of Santben Properties, Inc., testified that in conferences with representatives of the corporation, the petitioner presented a list of expenditures which be claimed he had incurred totaling approximately $34,000, and that he objected to some of these items, but accepted others. At one point he stated that the expenses which be approved amounted to $25,000 to $30,000. At another point he stated that they *294 amounted to $25,000 to $26,000. He further stated that he owed Patsy Frank more than the $29,087.94 which had been paid to him but that no further amount was paid because of the stoppage of work. At some time during the revenue agents' investigation or thereafter the petitioner submitted to the Internal Revenue Service a list purporting to show the summary of costs incurred by the corporation with respect to the Santben job. This list totals $25,951.15. Presumably such list was used by the petitioner in connection with conferences with Santben Properties, Inc.
In this state of the record we cannot conclude, as the petitioners would have us do, that the amount of $29,087.94 received by the corporation in 1948 on the basis of percentage of completion of the Santben job did not include some amount representing profit. Patrick and Pearl Panuzio - The petitioner testified that no profit was actually made on this job because the corporation had not been able to collect two notes totaling $100 given in partial payment on this job. However, there is no showing that the notes when given were not worth face value. No issue is raised as to a deduction on account of worthlessness of the notes *295 in any of the years in question. We have also concluded, in accordance with the contention of the petitioners, that the Cozza job was a so-called "fixed profit" job and that the total profit derived in the years 1948 and 1949 was $2,500. The respondent argues for a larger profit, contending that since the total amount that the revenue agents identified as having been paid to the subcontractor was $28,284.20, we should find that that was the extent of the costs. However, we cannot so conclude upon the basis of the evidence before us. The fact that the revenue agent could identify only that amount does not establish that these were all the costs that were incurred. The subcontract with Tarinelli called for the payment of $35,500, and both the petitioner and Tarinelli testified that the full amount was paid. We have, therefore, concluded and have found as a fact that the corporation incurred total operating costs of $35,500 on this job. The petitioners also urge that we conclude that certain jobs were done under contracts calling for a price of cost plus 10% and that they actually resulted in profits of 10%, namely, E. R. Clement, Inc., commenced in 1946; and Patrick and Pearl Panuzio, *296 Edward Demovick, and Sam Sobel, commenced in 1947. The evidence shows that the Clement and Demovick jobs were done on a cost plus 10% basis, but this is not established with respect to the other 2 jobs. It should be pointed out that the mere fact that a contract calls for cost plus a percentage of cost as profit does not in and of itself conclusively establish that the profit was the percentage recited. For example, the petitioner testified that he did not actually earn a 10% profit on the Clement contract, whereas Clement in his testimony implied that it was possible that he had paid more than 10% profit, due to the fact that some of the costs for which he was charged may have applied to some other job. However, in arriving at our conclusion that additional operating costs should be allowed for some years, we have assumed that profits on these cost-plus contracts did not vary substantially from the percentages called for in the contracts. We have concluded and have found as a fact that in the years 1946, 1947, and 1948 the corporation had operating costs, in addition to those allowed by the respondent, in the respective amounts of $14,000, $42,000, and $38,000. We cannot find from *297 the record that there were any additional costs for 1949 and 1950. The petitioners contend that in determining whether there are deficiencies in corporate tax there should be allowed either as an operating cost or as a deduction an amount representing reasonable salary to the petitioner as principal officer of the corporation. There was opinion evidence introduced as to the reasonable compensation of such an officer of corporations doing approximately the volume of business which the petitioner did. It is argued that since this was a one-man corporation it was unnecessary to go through the formality of voting a salary, and that in substance the petitioner took a reasonable salary by appropriating some of the corporate receipts. Section 23(a)(1)(A) of the Internal Revenue Code of 1939 provides that in computing net income there shall be allowed as deductions all the ordinary and necessary expenses paid or incurred during the taxable year, including a reasonable allowance for salary or other compensation for personal services. On the record we cannot find that any amount was paid or incurred by the corporation for petitioner's services other than $300 in 1946, $450 in 1947, and $500 *298 in 1948, as claimed in the corporate returns for those years. In the petition it was not affirmatively pleaded that there should be a greater allowance to the corporation for officers' salaries than the amounts claimed and allowed by the respondent. The only amounts which the petitioner included in his individual returns as salary from the corporation were these amounts, and in his testimony he did not state or intimate that the intention in appropriating receipts was to pay himself a salary. We think there is no merit in this contention of the petitioners. The Corporation - Additions to Tax on Account of Fraud Section 293(b) of the Internal Revenue Code of 1939 provides for additions to the tax if any part of any deficiency is due to fraud with intent to evade tax. The burden of proof upon the fraud issue is upon the respondent. Section 1112 of the Code. Fraud is never presumed, but must be shown by clear and convincing proof. Commissioner v. Kerbaugh, (C.A. 1) 74 F. 2d 749, affirming 29 B.T.A. 1014; Rogers v. Commissioner, (C.A. 6) 111 F. 2d 987, affirming 38 B.T.A. 16; Archer v. Commissioner, (C.A. 5) 227 F. 2d 270, affirming a Memorandum Opinion of this Court; Kurnick v. Commissioner, (C.A. 6) 232 F. 2d 678, *299 affirming a Memorandum Opinion of this Court; Arlette Coat Co., 14 T.C. 751; and Frank Imburgia, 22 T.C. 1002. To establish fraud by direct proof of intention is seldom possible, and whether it exists must be determined from the conduct of the taxpayer and the surrounding circumstances. Rogers v. Commissioner, supra; Lashells' Estate v. Commissioner, (C.A. 6) 208 F. 2d 430. In Holland v. United States, 348 U.S. 121, the Supreme Court declared that evidence of a consistent pattern of underreporting large amounts of income will support an inference of willfulness. Other cases which clearly hold that consistent failure to report substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent to evade tax are: Epstein v. United States, (C.A. 6) 246 F. 2d 563, certiorari denied 355 U.S. 868; Schwarzkopf v. Commissioner, (C.A. 3) 246 F. 2d 731, affirming a Memorandum Opinion of this Court; Shahadi v. Commissioner, (C.A. 3) 266 F. 2d 495, affirming 29 T.C. 1157, certiorari denied 361 U.S. 874; Kurnick v. Commissioner, supra; Drieborg v. Commissioner, (C.A. 6) 225 F. 2d 216, affirming in part a Memorandum Opinion of this Court; *300 and Kilpatrick v. Commissioner, (C.A. 5) 227 F.d 240, affirming 22 T.C. 446. The corporation reported a net loss of about $3,000 for 1946 and a net loss of about $100 for 1950. For 1947 it reported net income of $323.98 and tax liability of $68.04; for 1948 it reported net income of $878.20 and tax liability of $184.42; and for 1949 it reported net income of $281.47 and tax liability of $59.12. For the years 1946, 1949, and 1950 Adiletta's work sheets show the receipts from jobs which were included in gross receipts in the corporate returns. From the Findings of Fact it will be seen that gross receipts from certain jobs were not included at all and that only portions of gross receipts from certain other jobs were reported. The amounts not reported are substantial in relation to the gross receipts reported. The petitioners argue that we are concerned with unreported gross income, and not unreported gross receipts. However, except with respect to non-profit jobs, it necessarily follows that if gross receipts from particular jobs have been omitted, gross and net profits from such jobs have also been omitted. For the years 1947 and 1948 it cannot be determined which job receipts were *301 omitted from the returns, since Adiletta's work sheets for those years do not contain lists of gross receipts by jobs. However, the aggregate gross receipts which have been stipulated, and which we have found for those years, greatly exceed the gross receipts which were reported in the corporate returns, and we think the conclusion is justified that the same pattern was followed in those years as in the years 1946, 1949, and 1950. The petitioners argue that any omissions of income were not due to an intent to defraud but were due to negligence in failing to keep proper records, pointing out that in some instances mistakes in reporting were against the interest of the corporation. There were such errors but, with the exception of the overstatement of gross receipts from Verrilli in 1949 by the amount of about $1,200, such errors were insubstantial. It is also urged that the failure to properly report corporate profits was due to the petitioner's failure to realize the separate identity of the corporation, and that this in turn was due to the fact that the petitioner had only a limited formal education. The petitioner is an intelligent and experienced business man and we cannot accept *302 the view that he did not realize the separate identity of the corporation and its liability to pay taxes apart from his own liability. He set up not only this corporation, but also the Putnam Realty Co., Inc., to obtain the benefits of incorporation, and he caused tax returns to be filed for both entities. Furthermore, it is clear that he diverted a large part of the corporate receipts to his own use and failed to take them into account in either the corporation's returns or in his own. None of the diversions was included in his individual return as income, and as stated, the record shows specifically that in the years 1946, 1949, and 1950 receipts from specific jobs which were diverted were not reflected in the corporate returns. Apparently the petitioners contend that failure properly to report corporate income was the fault of Adiletta, and that therefore no fraud can be attributed to the corporation. The petitioner testified to the effect that Adiletta compiled all the figures which went into the returns, and that he signed them on behalf of the corporation without examining them. He said that although he did discuss with Adiletta the gross receipts for 1946, 1949, and 1950 this *303 was merely for the purpose of allocating to the proper year receipts from jobs lasting more than a year. Adiletta, on the other hand, testified that the only source of gross receipts available to him was the list which the petitioner furnished him at the end of each year. Lists of gross receipts for 1946, 1949, and 1950 contained in Adiletta's work sheets are in evidence. Two of such lists are in the handwriting of the petitioner. The petitioner testified that he did not make lists or assist to any extent in making lists of gross receipts from jobs performed in 1947 and 1948, and that he did not even confer with Adiletta in connection with such lists since he was sick and was in Florida when the returns for those years were prepared. He stated that he signed the corporate returns for those years in blank before he left for Florida, and that Adiletta filled them out and filed them. Adiletta testified that the petitioner did furnish him lists for 1947 and 1948, but that at the petitioner's request he gave them to the petitioner after the revenue agent's audit commenced, and that such lists were not returned to him. He further stated that no corporate returns were signed in blank and *304 left with him for filing. Both revenue agent Baker and revenue agent Dowdney testified that during the investigation the petitioner made reference to lists which had been prepared for the years 1947 and 1948. Furthermore, the evidence of record throws considerable doubt upon the credibility of the petitioner's testimony that he was in Florida at the time of preparing and filing the returns for 1947 and 1948. Particularly for the year 1948 is this true. The corporate return for that year purports to have been signed by the petitioner on January 10, 1949, and it was received by the collector on January 11. The evidence shows that the petitioner visited his safe deposit box in Bridgeport on January 11. We are satisfied from the testimony and the record as a whole that Adiletta, who was employed only part time by the petitioner and the corporation, did not have any source of information as to gross receipts except the petitioner, and that the petitioner, who signed the returns on behalf of the corporation, was aware of the fact that they did not contain all the taxable income of the corporation. In view of the pattern of omissions from the corporate returns for the years 1946 through 1950 *305 of substantial amounts of gross receipts and taxable income, particularly in view of the petitioner's own failure to report in his individual returns any diverted corporate receipts, we think the record clearly and convincingly establishes that some part of the deficiency in tax due from the corporation for each of such years was due to fraud with intent to evade tax. See Currier v. United States, (C.A. 1) 166 F. 2d 346. In so concluding we have not to any extent relied upon any presumption in favor of the correctness of the respondent's determination of deficiencies. With respect to the year 1950, the understatement of net income is not large in amount. However, the corporation had reported no net income and it is clear that gross receipts and profits from particular jobs were omitted from the return. Accordingly, it is our conclusion that the corporation is liable for an addition to tax for each year pursuant to section 293(b) of the Code. The Corporation - Statute of Limitations Section 276(a) of the Internal Revenue Code of 1939 provides that in the case of a false or fraudulent return with intent to evade tax, the tax may be assessed and collected at any time. Since we have *306 found that the corporate returns for the years 1946, 1947, and 1948 were false and fraudulent with intent to evade tax, it follows that assessment and collection of taxes for those years are not barred by the statute of limitations. Deficiencies Determined Against the Individual Petitioners In determining the deficiency for the taxable year 1948, the respondent increased reported net income by the amount of $2,276.35 as unreported net gain from the sale of capital assets. No evidence was presented by the petitioner with respect to this item and accordingly the respondent's determination in this respect is approved. The respondent increased reported net income for the taxable year 1949 by the amount of $4,333.70 as unreported net gain from the sale of capital assets. It has been stipulated that in 1949 the individual petitioners sold certain property for $12,500 and that no gain was reported on the transaction. There is no evidence as to the basis of this property. Since the petitioners have not shown error in this determination of the respondent, such determination is approved. For the taxable year 1948 the respondent determined that the amount of $14,793.72 received by the petitioners *307 from the sale, on June 30 of that year, of the store additions at East Main and Pearl Streets was taxable income in full, since he determined that these buildings had not been held for more than 6 months. It is his contention that the construction of these buildings had not been completed prior to January 1, 1948. The petitioner, on the other hand, contends that they were. The evidence with respect to the completion date of these buildings is confusing and to some extent contradictory. The petitioner testified at one point that to the best of his knowledge the buildings were completed in 1947, and at another point he testified that they were substantially complete at the end of that year. The tenant of one of the stores testified that although she did not commence business in the store which she had rented until February 1948, the construction of such store had been substantially completed by January 1948. She stated that she began setting up her business in the store about January 2, although there remained certain odds and ends of construction to be completed. Records of the Bridgeport building inspector's office indicate that some of the work necessary to complete the buildings *308 occurred after January 1, 1948. In this situation, although the evidence is not as satisfactory as might be desired, we have exercised our best judgment and have concluded and found as a fact that the construction of these buildings was 90% complete at the end of 1947. It follows, therefore, that the buildings, to the extent of 90% thereof, had been held for more than 6 months on the date of sale, June 30, 1948, and that to the extent of 10% thereof they had not been. Accordingly, under the provisions of section 117(b) and (j) of the Internal Revenue Code of 1939, as in effect in 1948, it follows that 90% of the gain is to be treated as long-term capital gain and that therefore only one-half thereof is to be taken into account in computing net capital gain and net income. The remaining 10% of the gain is, pursuant to section 112(a) of the Internal Revenue Code of 1939, includable in its entirety in computing net income. See Fred Draper, 32 T.C. 545, which follows Paul v. Commissioner, (C.A. 3) 206 F. 2d 763. The respondent determined that the individual petitioners diverted to their own use in the years 1946 through 1950 gross receipts of the corporation in the respective amounts *309 of $24,699.16, $63,190.84, $49,174.50, $8,145.23, and $8,630.22, and that these amounts constituted ordinary income to them. In arriving at these amounts the respondent gave the petitioners credit for such amounts as the revenue agents could ascertain that they had paid to or on behalf of the corporation, and thus arrived at net amounts diverted. Revenue Agent Dowdney testified, in effect, that in giving credit to the individual petitioners in calculating net diversions, no credit was given for any currency payments which the individual petitioners may have made to or on behalf of the corporation. We assume that he meant that no credit for currency payments was given aside from the stipulated amounts of currency deposited by the individual petitioners in the bank account of the corporation in the years 1949 and 1950 in the respective amounts of $171.75 and $30. The individual petitioners contend that the respondent was in error in not allowing them credit for substantial amounts of currency which they paid on behalf of the corporation. They contend that they had available the amounts of currency which they received from customers of the corporation or which they obtained by cashing *310 checks of customers of the corporation. As shown in our Findings of Fact, the amounts of currency so received amounted to $2,250 in 1946, $14,801.09 in 1947, $9,692.53 in 1948, $5,615.95 in 1949, and $14,218.22 in 1950, or a total of $46,577.79. The revenue agent testified that no part of this currency was credited as having been paid by the individuals on behalf of the corporation. The petitioners also claim that they had available additional currency which was kept in the petitioner's safe deposit box at the bank and in a safe in his home. [8] *311 The petitioner testified that none of the corporate diversions were for his personal benefit. He stated that he made payments in currency to employees of the corporation and also to subcontractors of the corporation. He kept no record of cash expenditures and could not testify as to any specific payments which he made in currency on behalf of the corporation. He named about a dozen subcontractors to whom he stated he made currency payments, stating that some of them are now deceased. Only two of the named persons testified. They stated that sometimes they received cash payments and sometimes they received payments by check. One of them could *312 not recall how much was paid in currency and the other thought that about $3,000 had been paid to him over the years in question, and that about 40% was in currency. See footnote 5, supra. As pointed out above, we have found that costs of operation had been incurred by the corporation for the years 1946, 1947, and 1948, in addition to the costs found by the respondent, in the respective amounts of $14,000, $42,000, and $38,000. We did not, in connection with these additional corporate costs, conclude whether they were paid in currency or by check or whether they were made directly by the corporation or by the individual petitioners on its behalf. It may well be that these additional amounts were paid, at least in part, by the corporation itself either by check or in currency. Presumably the revenue agents would have found most of the payments which were made by the corporation by check, and accordingly we think it logical to assume that most of these additional payments were made by currency. The corporation itself may have had sufficient currency to pay the major portion of the additional costs through cashing customers' checks. However, in view of the testimony of the petitioner *313 and two of the subcontractors, we have concluded that portions of the additional costs were paid by the individuals in currency. The difficulty is that there is no evidence as to any specific payments which were so made by the individuals. Because of this state of the evidence we are here presented a more difficult task than faced us in fixing the amount of additional costs incurred by the corporation. Nevertheless, here also we consider it incumbent upon us to fix some amount as representing currency payments made by the individuals on behalf of the corporation. We have done the best we can in this situation and have found as a fact that in the years 1946, 1947, and 1948 the individual petitioners made such payments on behalf of the corporation in the respective amounts of $1,000, $4,000, and $3,000. These amounts have been taken into consideration in fixing the amounts of net diversions which are set forth in the Findings of Fact. The respondent takes the position that the net amounts diverted by the individual petitioners constitute ordinary income to them in their entirety under the broad provisions of section 22(a) of the Code. [9] *315 The petitioners, on the other hand, contend in *314 effect that the respondent is required to treat any net amounts diverted from the corporation as distributions from the corporation, and that under the provisions of section 115 of the Internal Revenue Code of 1939, [10] *316 such amounts are taxable to them as ordinary income only to the extent they constitute constructive dividends, that such amounts are dividends only to the extent of available earnings and profits of the corporation, and that any amounts received over and above such available earnings and profits are taxable as capital gain to the extent they exceed the investment in the stock of the corporation. The case of Charles R. Leaf, 33 T.C. 1093, affd. (C.A. 6) 295 F. 2d 503, is decisive upon this issue. In that case the taxpayer withdrew net amounts from his wholly-owned corporation for his own use and benefit. The corporation had no accumulated earnings and profits. We there held that the taxpayer had such control over the net amount of funds withdrawn that they represented taxable income to him, citing Rutkin v. United States, 343 U.S. 130, and Davis v. United States, (C.A. 6) 226 F. 2d 331, certiorari denied 350 U.S. 965, and quoting from the Rutkin case as follows: An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. * * * That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will, even though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it. Such gains are taxable in the yearly period during which they are realized. *317 * * *. Thus the Leaf case stands for the proposition that amounts of corporate funds diverted by the dominant stockholder of a corporation constitute income to him regardless of whether they might be treated as a constructive dividend, and that taxability to the stockholder need not turn upon the existence of corporate earnings and profits. Cf. Currier v. United States, supra, and United States v. Goldberg, (C.A. 3, March 17, 1964) - F. 2d -. We see no essential difference between the Leaf case and the instant case. Here the net diversions were appropriated by the petitioner Patsy F. DiZenzo to his own use and benefit. We accordingly hold that the net amounts of diversions are taxable to him as ordinary income. The petitioner appropriated to himself in the taxable years 1947 through 1951 additional rent due Putnam Realty Co., Inc., in the aggregate amount of $13,863.34. The respondent similarly treated these amounts as taxable income to the individual petitioners. The petitioners contend that these amounts were not income but represented repayments of amounts owed to them by such company because of payments made by them to Battistelli on behalf of the company. As pointed out in *318 the Findings of Fact, the individual petitioners in 1942 and 1943 made specific payments to Battistelli totaling $10,000 (the family home apparently having been transferred at a value of $6,000). In addition, the petitioner testified that other cash payments were made to Battistelli to satisfy his total claim. It is their contention that they diverted only a sufficient amount of rental receipts to repay themselves amounts owed to them by the company, and that after March 1951, they ceased to divert rentals to themselves. We cannot conclude that these diversions amounted to repayments of amounts owing from Putnam Realty Co., Inc., to the petitioners. In the first place, the payments made to Battistelli were in satisfaction of the liability of Patsy Frank, Inc., to Battistelli. There is no intimation in the record that these payments resulted in the creation of a valid debt owing from Putnam Realty Co., Inc., to the petitioners. There is no evidence as to any payments being carried on the books of Putnam Realty Co. as an amount owed to them. Nor was there, prior to 1947, any payment made by Putnam Realty Co., Inc., to the petitioners on any purported indebtedness. It was not until 1947 *319 when the Rent Control Board granted a 5% increase in rental to be charged by Putnam Realty Co. that the petitioner appropriated any receipts of that corporation. And this increase, which was appropriated, was never reflected on the books of that corporation as a receipt or as a payment by the company to the petitioner. We note that the excess of the amount of rent appropriated by the petitioner over the amount due Battistelli for the plumbing work and interest was $1,344.65. The petitioner attempted to explain this by stating that there were other amounts owing to them by Putnam Realty Co., Inc. There is no evidence whatever as to how any such remaining claimed indebtedness arose. Under the circumstances, it is our conclusion that the amounts of rent appropriated by the petitioner constituted diversions of income of Putnam Realty Co., Inc. Here, as in the case of the diversions from Patsy Frank, Inc., the amounts constitute taxable income to him. It is apparent that even with the adjustments which we have made, a recomputation will show that the individual petitioners had net income in each year substantially in excess of the amounts which they reported on their returns. The petitioners *320 contend that the net worth statement which they had submitted to the Internal Revenue Service during the investigation, and which was introduced in evidence, shows that they could not have made such amounts of income in the years in question since such statement shows a net worth increase of only about $9,000 over the period from December 31, 1947 to December 31, 1951. However, this net worth statement was submitted in evidence without any attempt at substantiation. Furthermore, neither the petitioners nor the respondent computed the petitioners' tax liability by employing the net worth method. We do not consider this net worth statement of any probative value. The Individuals - Additions to Tax on Account of Fraud For the taxable year 1946 the petitioners reported net income of $3,858.35 and tax liability of $564.40; for 1947 they reported net income of $4,002.65 and tax liability of $589.55; for 1948 they reported net income of $11,323.80 and tax liability of $1,924.32; for 1949 they reported net income of $7,098.51 and tax liability of $1,031.56; for 1950 they reported net income of $6,130.36 and tax liability of $882.26; and for 1951 they reported net income of $9,054.87 and tax *321 liability of $1,679.50. In each of the years 1946 through 1950 the petitioner diverted from the corporation substantial amounts of corporate receipts, no part of which was included in his return. Such amounts totaled $10,699.16 in 1946, $59,190.84 in 1947, $46,174.50 in 1948, $7,607.23 in 1949, and $3,943.22 in 1950. As pointed out hereinabove, these amounts are taxable to him as ordinary income. In each of the years 1947 through 1951 the petitioner diverted from Putnam Realty Co., Inc., rental receipts which he did not reflect in his return. Such receipts totaled $1,279.16 in 1947, $3,585.21 in 1948, $4,045.12 in 1949, $4,267.95 in 1950, and $685.90 in 1951. These receipts also constituted ordinary income to the petitioner. In addition, in each of the years 1946 through 1950 the petitioners omitted interest income from their returns, in each of the years 1946 through 1949 they omitted capital gains from their returns, and in the year 1947 they omitted a taxable commission, there being no explanation for any of such omissions. These omissions totaled $2,234.03 in 1946, $3,117.94 in 1947, $2,528.63 in 1948, $5,180.53 in 1949, and $1,217.86 in 1950. In each of the years 1946, 1947, *322 and 1948 the petitioners claimed in their returns as offsets to rental income substantial amounts of interest on a mortgage ( $750 in 1946 and 1947 and $375 in 1948), whereas the amounts of interest paid on the mortgage were only $11.64 in 1946, $7.76 in 1947, and $3.88 in 1948. It is obvious, therefore, that the petitioners substantially underreported their taxable income for each of the years 1946 through 1950, and that as a result thereof there are deficiencies in tax. Here, as in the case of the corporation, it is our conclusion that this consistent pattern of underreporting substantial amounts of income in those years clearly and convincingly establishes that some part of the deficiency in tax for each of such years was due to fraud with intent to evade tax. In addition, we think that the pattern of diverting large amounts of corporate receipts from Patsy Frank, Inc., is in itself indicative of a fraudulent intent to evade tax. Similarly, the diversions of substantial amounts of rental receipts of Putnam Realty Co., Inc., without reporting such receipts either in the individual return or in the return of such company is indicative of fraud. We also consider that the fact that *323 the petitioners for the years 1946, 1947, and 1948 claimed substantial amounts of interest paid when in reality negligible amounts were paid, is indicative of fraud. The deficiency in tax for the taxable year 1951 is due principally to the omission of about $686 of rental receipts diverted by the individual petitioner from Putnam Realty Co., Inc. While this omission and the resulting deficiency are relatively small, the omission follows the pattern of omissions for the preceding years and we think is indicative of a fraudulent intent to evade tax, particularly since the amount omitted was not included as income in the return of Putnam Realty Co., Inc. It follows that some part of the deficiency for 1951 is due to fraud with intent to evade tax. In reaching our conclusion that some part of the deficiency for each year is due to fraud with intent to evade tax we have not relied to any extent upon the presumption in favor of the correctness of the respondent's determination of deficiencies. It should also be added that evidence of the conviction of the petitioner, on a plea of nolo contendere, of filing a false and fraudulent income tax return for the year 1950 was received as affecting *324 his credibility. See District of Columbia Code, 1961, sec. 14-305; Lillian Kilpatrick, 22 T.C. 446, affd. (C.A. 5) 227 F. 2d 240; and Masters v. Commissioner, (C.A. 3) 243 F. 2d 335, affirming 25 T.C. 1093. Our conclusion that some part of the deficiency for each year is due to fraud with intent to evade tax is not based to any extent upon such conviction. We hold that the individual petitioners are liable for an addition to tax for each of the years in question, pursuant to section 293(b) of the Code. The Individuals - Statute of Limitations Since we have found that the returns filed by the individual petitioners for the taxable years 1946 through 1950 were false and fraudulent with intent to evade tax, it follows, pursuant to section 276(a) of the Code, that assessment and collection of taxes for those years are not barred by the statute of limitations. Underestimation of Estimated Tax The individual petitioners in their pleadings allege error in the respondent's determination that they are liable for an addition to tax under section 294(d)(2) of the Code, [11] for underestimation of estimated tax for each of the taxable years 1946 through 1951. On brief they do not discuss *325 this issue. The amount of any underestimation and the resulting addition to tax will be computed in connection with the recomputation under Rule 50. Transferee Liabilities By his answer and amended answer the respondent made allegations of transfers, without consideration, from the corporation to the petitioner Patsy F. DiZenzo in each of the taxable years 1946 through 1950, the aggregate being $249,448.67, and alleged that he is liable, as a transferee, for any unpaid taxes and additions to tax due from the corporation for those years, plus statutory interest. He also made allegations of transfers, without consideration, from the petitioner Patsy F. DiZenzo to the petitioner Anna DiZenzo in the taxable years 1949 and 1950, the aggregate being $147,675, and alleged that she is liable, as *326 a transferee of a transferee, for any unpaid taxes and additions to tax due from the corporation for its taxable years 1946 through 1950, plus statutory interest. Section 311 of the Internal Revenue Code of 1939 provides that there shall be assessed, collected and paid, in the same manner as in the case of a deficiency in tax, the liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax imposed upon the taxpayer. The transferee liability is to be determined by reference to state law. In lien of resorting to an in rem action in an equity proceeding, the respondent is authorized to proceed to collect the liabilities of transferees by the substitute procedure provided in section 311. Commissioner v. Stern, 357 U.S. 39, and Vernon W. Bingham, 30 T.C. 900. The burden of proof is upon the respondent to show that the petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax. Section 1119 of the Code. The petitioners contend that the respondent has not borne his burden of proving transferee liability since he has not shown that at the times of the various transfers the transferors were *327 rendered insolvent or unable to pay their obligations, including their obligations to the United States. The petitioners were residents of the State of Connecticut and the transfers were made in that state. Section 52-522 of the General Statutes of Connecticut provides as follows: Fraudulent conveyances, when void. All fraudulent conveyances, suits, judgments, executions or contracts, made or contrived with intent to avoid any debt or duty belonging to others, shall, notwithstanding any pretended consideration therefor, be void as against those persons only, their heirs, executors, administrators or assigns, to whom such debt or duty belongs. (1949 Rev., S. 8295.) The rule in Connecticut, as developed by its courts, is that a transfer made to avoid the payment of a particular debt is void as to the creditor, if the transferee had knowledge of and participated in the fraud, and that a transfer made without any such purpose, but without consideration, and when the transferor was insolvent, is also void. This rule is applicable to all transfers, including transfers between husband and wife, although in the latter case the transfer is subject to a rigorous scrutiny. The rule is stated *328 as follows in Fishel & Levy v. Motta, 76 Conn. 197, 56 Atl. 558: If the conveyance to the wife was, to her knowledge, made to avoid the payment of the plaintiffs' debt, it was void as to them ( Hawes v. Mooney, 39 Conn. 37; Bassett v. McKenna, 52 Conn. 437); or if made without any such purpose, but without consideration, and when the husband was considerably indebted and insolvent, it was void as to the plaintiffs ( Redfield v. Buck, 35 Conn. 328, 95 Am. Dec. 241; Paulk v. Cooke, 39 Conn. 566; Quinnipiac Brewing Co. v. Fitzgibbons, 71 Conn. 80, 40 Atl. 913). In the former case it would be void for actual fraud participated in by the wife, and in the latter for what is called, for want of a better name, constructive fraud. * * * That the relation of husband and wife gives special opportunities for fraudulent transfers of property, and that conveyances between them "should be subject to a reigorous scrutiny," are considerations to be addressed to the trier in passing upon the question of want of consideration. * * * To the same effect are Boiselle v. Rogoff, 126 Conn. 635, 13 A. 2d 753, and Genovese Coal & Mason's Mat. Co. v. River Bend Builders, 146 Conn. 48, 147 A. 2d 193. *329 See also Reconstruction Finance Corp. v. United Distillers Products Corp., (C.A. 2) 229 F. 2d 665. We will consider first the transfers from the corporation to the petitioner - that is, the amount of corporate receipts diverted by the petitioner. We think the record as a whole establishes that the diversions were made or contrived with intent to avoid the payment of taxes due from the corporation. The corporation did not keep records from which its receipts could be determined. The petitioner diverted many checks received from customers of the corporation, some of which were drawn in favor of the corporation and some in his favor, cashing many of them and depositing some in his and his wife's bank accounts and some in the bank account of his controlled corporation, Putnam Realty Co., Inc. He also diverted currency payments made by customers of the corporation. He kept no records of the amounts diverted. He also caused mortgage notes given by the corporation's customers to be made out in his name. The diversions were not reported in his individual tax returns. In June 1950, the corporation's equipment was sold to the petitioner's son for $2,300 and the corporation ceased business operations. *330 The petitioner cashed the check received for the equipment. On December 31, 1950, the corporation's bank account showed a balance of only $3.13. Since the diversions were made or contrived with intent to avoid the payment of taxes due from the corporation, they are, pursuant to section 52-522 of the General Statutes of Connecticut, void as against the Federal Government, and render the petitioner liable as a transferee. Under such circumstances it was not necessary for the respondent to show that the corporation was rendered insolvent by the diversions. It may be added, nevertheless, that the record very strongly indicates that the diversions did render the corporation insolvent inasmuch as the corporation had assets of relatively small value and apparently did not carry large amounts in its bank account. It should be pointed out, however, that the liability of the petitioner as transferee is not measured by the gross amounts diverted, as claimed by the respondent. The amounts repaid to the corporation or amounts paid by the petitioner on its behalf serve to reduce the amount of his transferee liability. Fada Gobins, 18 T.C. 1159, affd. (C.A. 9), 217 F. 2d 952; Louise Noell, 22 T.C. 1035, *331 appeal dismissed (C.A. 8) 234 F. 2d 665; and Robert Ginsberg, 35 T.C. 1148, affd. (C.A. 2) 305 F. 2d 664. The petitioner's liability as a transferee is to be measured by the net amount of diversions as found by us. It is true that some of the amounts diverted went to Putnam Realty Co., Inc., and some went to the petitioner Anna DiZenzo. However, it was the petitioner Patsy F. DiZenzo who diverted the corporate receipts and controlled their disposition. It has been stipulated that the petitioner Patsy F. DiZenzo transferred to Anna DiZenzo, without consideration, the amount of $147,675 in the years 1949 and 1950. However, it is our conclusion that the respondent has not met his burden of proving that these transfers rendered her liable, as a transferee, for his transferee liability. Under Connecticut law these transfers are not void for actual fraud unless the wife had knowledge of and participated in the fraud. Here, even if we were to accept the respondent's view that the transfers were part of an over-all plan by the petitioner Patsy F. DiZenzo to avoid the payment of the corporation's tax, there is no evidence that Anna DiZenzo was aware of any such tax-avoidance motive or that *332 she participated therein. The record does not show that she was any more than a passive recipient of the money and mortgage notes transferred. Nor can we conclude that the transfers to Anna DiZenzo were void on account of constructive fraud. To hold that there was constructive fraud would require a showing that the petitioner Patsy F. DiZenzo was insolvent at the times of the transfers. It has been held that the burden of proof in this respect is upon the plaintiff. Fishel & Levy v. Motta, supra; State v. Martin, 77 Conn. 142, 58 Atl. 745; Dombron v. Rogozinski, 120 Conn. 245, 180 Atl. 453; and Boiselle v. Rogoff, supra.In the instant case the respondent has not attempted to show the financial condition of the petitioner Patsy F. DiZenzo at the times of the transfers and we cannot conclude on this record that he was insolvent or that the transfers rendered him insolvent. Decisions will be entered under Rule 50. Footnotes
*. Proceedings of the following petitioners are consolidated herewith: Patsy F. DiZenzo, Transferee, Docket No. 72736; Anna DiZenzo, Transferee, Docket No. 72737; and Patsy Frank, Inc., Docket No. 72739.↩
*. All statutory references are to the Internal Revenue Code of 1939.↩
*. Job bid by others. **. Work performed at cost.↩
1. The amount credited was reduced by the respondent by the amount of $22,000 which he determined was the cost which the petitioners reimbursed the corporation for the construction of the building for them at 1286 Kossuth Street. As stated above, however, the amount of cost of such building which was reimbursed by the petitioners to the corporation was only $9,000 and consequently the respondent was in error in reducing the credit by any more than $9,000.↩
**. Work performed at cost↩
*. Job bid by others 2. The respondent properly reduced the amount credited to the individual petitioners by an amount of $22,859 which constituted a reimbursement made by them to the corporation for the costs incurred by the corporation in 1947 in making additions to stores owned by the individual petitioners on East Main Street.↩
3. Subsequently, in 1957, Putnam Realty Co., Inc., paid the tax and additions to tax attributable to these receipts.↩
*. Job bid by others ↩
**. Work performed at cost↩
4. The respondent properly reduced the amount credited to the individual petitioners by an amount of $9,623 which constituted a reimbursement made by them to the corporation for the costs incurred by the corporation in 1948 in making additions to stores owned by the individual petitioners on East Main Street.
*. Job bid by others **. Work performed at cost↩
*. Job bid by others. ↩
**. Work performed at cost.↩
5. The petitioner testified that he made currency payments in the years in question to subcontractors, that he does not remember the amounts, but that he paid "quite a little money, I think over the years." He testified that he could remember the names of some of the subcontractors to whom currency payments were made and he named about a dozen, some of whom he testified are now deceased. Only two testified. One of them, Anthony Mingolatio, who did plaster and masonry jobs for the corporation during the years in question, employing several men, testified that generally he was paid by check but that sometimes he was paid in currency. He had no records or recollection of how much was paid. James Mario, an excavating contractor, who did work for the corporation during the years in question, testified that he was sometimes paid by check and sometimes in currency. He kept no records and had no definite recollection but stated that the proportion would be about 60% by check and that the jobs done would amount to about $3,000 for the years in question. The petitioner also testified that he sometimes made currency payments to the corporation's employees, but that he has no record of the amounts so paid.
6. He testified in effect, although his testimony is somewhat confusing, that during the years 1946 through 1950 his usual custom in submitting bids for jobs on behalf of the corporation was to figure profit at from 15 to 18% on jobs under $1,000, 12 to 15% on jobs ranging from $1,000 to about $3,000, about 10% on jobs between $3,000 and $10,000, and about 8% on jobs over $10,000. He stated that these percentages varied depending upon other considerations such as the type of work and the location of the job, and that bid jobs were computed on a lesser profit margin than negotiated jobs. ↩
7. The professional cost consultant testified that on competitive bid jobs during the period 1946 to 1950 contractors doing the type of work the corporation was doing in the Bridgeport area made normal average gross profits of about 30% on jobs having a cost of up to $4,000, 12% on jobs having a cost of from $4,000 to $10,000, and not more than 10% on jobs having a cost above $10,000.
8. The petitioner testified that in 1946 he had $35,000 to $40,000 in the safe deposit box, that he did not remember the precise amount contained in such box at the end of 1946 but that it would be about $35,000 to $40,000, and that he did not know how much currency was in the box at the end of 1948, 1949, or 1950. He also stated that he did not know how much currency was in the safe in his home at the end of any of the years 1946 through 1950, but that he kept from $5,000 to $7,000 in such safe. The petitioner did not keep any record of cash on hand, and we have no way of knowing how much he had available, aside from the total amount of $46,577.79 mentioned hereinabove. In the net worth statement which he submitted to the Internal Revenue Service covering the period from December 31, 1947 through December 31, 1951, he represented that he had cash on hand (aside from cash in banks) at the end of the years 1947 through 1951 in the respective amounts of $36,000, $1,000, $15,000, $55,000, and $1,000. The petitioner did not explain the source of any currency which was contained in his safe deposit box or in his safe, nor was any statement made to prove the accuracy of the net worth statement.
9. Section 22(a) provides in part as follows: "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *. 10. Section 115 of the Code provides in part as follows: (a) Definition of Dividend. The term "dividend" when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *. (b) Source of Distributions. For the purposes of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. * * *. * * *
(d) Other Distributions from Capital. If any distribution made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the manner as a gain from the sale or exchange of property. * * *.
11. Section 294(d)(2) provides in part: If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35) * * * exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. * * *.↩